RAMAH NAVAJO SCHOOL BOARD, INC., ET AL. *v.*
BUREAU OF REVENUE OF NEW MEXICO

No. 80–2162.   Argued April 28, 1982—Decided July 2, 1982

MARSHALL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. REHNQUIST, J., filed a dissenting opinion, in which WHITE and STEVENS, JJ., joined, *post*, p. 847.

*Michael P. Gross* argued the cause for appellants. With him on the briefs were *Carl Bryant Rogers* and *Neal A. Jackson.*

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins, Elinor Hadley Stillman, Edward J. Shawaker,* and *Maria A. Iizuka.*

*Jan Unna,* Special Assistant Attorney General of New Mexico, argued the cause for appellee. With him on the brief were *Jeff Bingaman,* Attorney General, and *Gerald B. Richardson,* Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed by *George P. Vlassis* and *Katherine Ott* for the Navajo Tribe of Indians; and by *Richard W. Hughes* for the Pueblo of Santa Ana.

*Helena S. Maclay* and *Deirdre Boggs,* Special Assistant Attorneys General of Montana, *Leland T. Johnson,* Assistant Attorney General of Washington, *Warren Spannaus,* Attorney General of Minnesota, *Mark V. Meierhenry,* Attorney General of South Dakota, and *Richard H. Bryan,* Attorney General of Nevada, filed a brief for the State of Montana et al. as *amici curiae* urging affirmance.

Briefs of *amici curiae* were filed by *George Deukmejian,* Attorney General, and *Neal J. Gobar,* Deputy Attorney General, for the State of California; and by *Arthur Lazarus, Jr.,* for the Association of American Indian Affairs, Inc.

JUSTICE MARSHALL delivered the opinion of the Court.

In this case, we address the question whether federal law pre-empts a state tax imposed on the gross receipts that a non-Indian construction company receives from a tribal school board for the construction of a school for Indian children on the reservation. The New Mexico Court of Appeals held that the gross receipts tax imposed by the State of New Mexico was permissible. Because the decision below is inconsistent with *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980) *(White Mountain)*, we reverse.

## I

Approximately 2,000 members of the Ramah Navajo Chapter of the Navajo Indian Tribe live on tribal trust and allotment lands located in west central New Mexico. Ramah Navajo children attended a small public high school near the reservation until the State closed this facility in 1968. Because there were no other public high schools reasonably close to the reservation, the Ramah Navajo children were forced either to abandon their high school education or to attend federal Indian boarding schools far from the reservation. In 1970, the Ramah Navajo Chapter exercised its authority under Navajo Tribal Code, Title 10, § 51 (1969), and established its own school board in order to remedy this situation. Appellant Ramah Navajo School Board, Inc. (the Board), was organized as a nonprofit corporation to be operated exclusively by members of the Ramah Navajo Chapter. The Board is a Navajo "tribal organization" within the meaning of 25 U. S. C. § 450b(c), 88 Stat. 2204. With funds provided by the federal Bureau of Indian Affairs (BIA) and the Navajo Indian Tribe, the Board operated a school in the abandoned public school facility, thus creating the first independent Indian school in modern times.[1]

---

[1] On July 8, 1970, in his Message to the Congress on Indian Affairs, President Nixon referred specifically to these efforts of the Board to assume responsibility for the education of tribal children abandoned by the

In 1972, the Board successfully solicited from Congress funds for the design of new school facilities. Pub. L. 92–369, 86 Stat. 510. The Board then contracted with the BIA for the design of the new school and hired an architect. In 1974, the Board contracted with the BIA for the actual construction of the new school to be built on reservation land. Funding for the construction of this facility was provided by a series of congressional appropriations specifically earmarked for this purpose.[2] The contract specified that the Board was the design and building contractor for the project, but that the Board could subcontract the actual construction work to third parties. The contract further provided that any subcontracting agreement would have to include certain clauses governing pricing, wages, bonding, and the like, and that it must be approved by the BIA.

The Board then solicited bids from area building contractors for the construction of the school, and received bids from two non-Indian firms. Each firm included the state gross receipts tax as a cost of construction in their bids, although the tax was not itemized separately. Appellant Lembke Construction Co. (Lembke) was the low bidder and was awarded the contract. The contract between the Board and Lembke provides that Lembke is to pay all "taxes required by law." Lembke began construction of the school facilities in 1974 and continued this work for over five years. During that time, Lembke paid the gross receipts tax and, pursuant to standard industry practice, was reimbursed by the Board for the full amount paid. Before the second contract between Lembke and the Board was executed in 1977, a clause was inserted into the contract recognizing that the Board could

---

State as a "notable exampl[e]" of Indian self-determination. 6 Weekly Comp. of Pres. Doc. 894, 899 (1970).

[2] See Pub. L. 93–245, 87 Stat. 1073 (1973) (amending Pub. L. 93–120, 87 Stat. 431 (1973) to specifically earmark funds appropriated there for the construction of the Ramah school facility); Pub. L. 93–404, 88 Stat. 810 (1974); Pub. L. 94–165, 89 Stat. 985 (1975); Pub. L. 95–74, 91 Stat. 293 (1977).

litigate the validity of this tax and was entitled to any refund.

Both Lembke and the Board protested the imposition of the gross receipts tax. In 1978, after exhausting administrative remedies, they filed this refund action against appellee New Mexico Bureau of Revenue in the New Mexico District Court. At the time of trial, the parties stipulated that the Board had reimbursed Lembke for tax payments of $232,264.38 and that the Board would receive any refund that might be awarded.

The trial court entered judgment for the State Bureau of Revenue. After noting that the "legal incidence" of the tax fell on the non-Indian construction firm, the court rejected appellants' arguments that the tax was pre-empted by comprehensive federal regulation and that it imposed an impermissible burden on tribal sovereignty. The Court of Appeals for the State of New Mexico affirmed. 95 N. M. 708, 625 P. 2d 1225 (1980). Although acknowledging that the economic burden of the tax fell on the Board, the Court of Appeals concluded that the tax was not preempted by federal law and that it did not unlawfully burden tribal sovereignty. The Board filed a petition for rehearing in light of this Court's intervening decisions in *White Mountain, supra,* and *Central Machinery Co.* v. *Arizona State Tax Comm'n,* 448 U. S. 160 (1980). The Court of Appeals denied the petition, stating only that this case did not involve either "a comprehensive or pervasive scheme of federal regulation" or "federal regulation similar to the Indian trader statutes." App. to Juris. Statement 36. After initially granting discretionary review, the New Mexico Supreme Court quashed the writ as improvidently granted. 96 N. M. 17, 627 P. 2d 412 (1981). We noted probable jurisdiction. 454 U. S. 1079 (1981).

## II

In recent years, this Court has often confronted the difficult problem of reconciling "the plenary power of the States over residents within their borders with the semi-

autonomous status of Indians living on tribal reservations."
*McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164,
165 (1973). Although there is no definitive formula for re-
solving the question whether a State may exercise its author-
ity over tribal members or reservation activities, we have
recently identified the relevant federal, tribal, and state in-
terests to be considered in determining whether a particular
exercise of state authority violates federal law. See *White
Mountain,* 448 U. S., at 141–145.

## A

In *White Mountain,* we recognized that the federal and
tribal interests arise from the broad power of Congress to
regulate tribal affairs under the Indian Commerce Clause,
Art. I, § 8, cl. 3, and from the semi-autonomous status of In-
dian tribes. 448 U. S., at 142. These interests tend to
erect two "independent but related" barriers to the exercise
of state authority over commercial activity on an Indian res-
ervation: state authority may be pre-empted by federal law,
or it may interfere with the tribe's ability to exercise its sov-
ereign functions. *Ibid.* (citing, *inter alia, Warren Trading
Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965);
*McClanahan* v. *Arizona State Tax Comm'n, supra;* and *Wil-
liams* v. *Lee,* 358 U. S. 217 (1959)). As we explained in
*White Mountain:*

> "The two barriers are independent because either,
> standing alone, can be a sufficient basis for holding state
> law inapplicable to activity undertaken on the reserva-
> tion or by tribal members. They are related, however,
> in two important ways. The right of tribal self-govern-
> ment is ultimately dependent on and subject to the broad
> power of Congress. Even so, traditional notions of In-
> dian self-government are so deeply engrained in our ju-
> risprudence that they have provided an important 'back-
> drop,' . . . against which vague or ambiguous federal
> enactments must always be measured." 448 U. S., at

143 (quoting *McClanahan* v. *Arizona State Tax Comm'n, supra,* at 172).

The State's interest in exercising its regulatory authority over the activity in question must be examined and given appropriate weight. Pre-emption analysis in this area is not controlled by "mechanical or absolute conceptions of state or tribal sovereignty"; it requires a particularized examination of the relevant state, federal, and tribal interests. 448 U. S., at 145. The question whether federal law, which reflects the related federal and tribal interests, pre-empts the State's exercise of its regulatory authority is not controlled by standards of pre-emption developed in other areas. *Id.,* at 143–144. Instead, the traditional notions of tribal sovereignty, and the recognition and encouragement of this sovereignty in congressional Acts promoting tribal independence and economic development, inform the pre-emption analysis that governs this inquiry. See *id.,* at 143, and n. 10. Relevant federal statutes and treaties must be examined in light of "the broad policies that underlie them and the notions of sovereignty that have developed from historical traditions of tribal independence." *Id.,* at 144–145. As a result, ambiguities in federal law should be construed generously, and federal pre-emption is not limited to those situations where Congress has explicitly announced an intention to pre-empt state activity. *Id.,* at 143–144, 150–151.

In *White Mountain,* we applied these principles and held that federal law pre-empted application of the state motor carrier license and use fuel taxes to a non-Indian logging company's activity on tribal land. We found the federal regulatory scheme for harvesting Indian timber to be so pervasive that it precluded the imposition of additional burdens by the relevant state taxes. *Id.,* at 148. The Secretary of the Interior (Secretary) had promulgated detailed regulations for developing " 'Indian forests by the Indian people for the purpose of promoting self-sustaining communities.' " *Id.,* at 147 (quoting 25 CFR § 141.3(a)(3) (1979)).

Under these regulations, the BIA was involved in virtually every aspect of the production and marketing of Indian timber. 448 U. S., at 145–148. In particular, the Secretary and the BIA extensively regulated the contractual relationship between the Indians and the non-Indians working on the reservation: they established the bidding procedure, set mandatory terms to be included in every contract, and required that all contracts be approved by the Secretary. *Id.*, at 147.

We found that the state taxes in question would "threaten the overriding federal objective of guaranteeing Indians that they will 'receive . . . the benefit of whatever profit [the forest] is capable of yielding. . . .'" *Id.*, at 149 (quoting 25 CFR § 141.3(a)(3) (1979)). We concluded that the imposition of state taxes would also undermine the Secretary's ability to carry out his obligations to set fees and rates for the harvesting and sale of the timber, and it would impede the "Tribe's ability to comply with the sustained-yield management policies imposed by federal law." 448 U. S., at 149–150. Balanced against this intrusion into the federal scheme, the State asserted only "a general desire to raise revenue" as its justification for imposing the taxes. *Id.*, at 150. In this context, this interest is insufficient to justify the State's intrusion into a sphere so heavily regulated by the Federal Government. *Ibid.*

B

This case is indistinguishable in all relevant respects from *White Mountain.* Federal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive. The Federal Government's concern with the education of Indian children can be traced back to the first treaties between the United States and the Navajo Tribe.[3] Since that time, Congress has enacted numerous

---

[3] Article VI of the 1868 Treaty between the United States and the Navajo Tribe, 15 Stat. 669, provides that "[i]n order to insure the civiliza-

statutes empowering the BIA to provide for Indian education both on and off the reservation. See, *e. g.*, Snyder Act, 42 Stat. 208 (1921), 25 U. S. C. § 13; Johnson-O'Malley Act, 48 Stat. 596 (1934), 25 U. S. C. § 452 *et seq.;* Navajo-Hopi Rehabilitation Act, 64 Stat. 44 (1950), 25 U. S. C. § 631 *et seq.;* Indian Self-Determination and Education Assistance Act, 88 Stat. 2203 (1975), 25 U. S. C. § 450 *et seq.* (Self-Determination Act). Although the early focus of the federal efforts in this area concentrated on providing federal or state educational facilities for Indian children, in the early 1970's the federal policy shifted toward encouraging the development of Indian-controlled institutions on the reservation. See 6 Weekly Comp. of Pres. Doc. 894, 899–900 (1970) (Message of President Nixon).

This federal policy has been codified in the Indian Financing Act of 1974, 88 Stat. 77, 25 U. S. C. § 1451 *et seq.*, and most notably in the Self-Determination Act. The Self-Determination Act declares that a "major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being." 88 Stat. 2203, as set forth in 25 U. S. C. § 450a(c). In achieving this goal, Congress expressly recognized that "parental and community control of the educational process is of crucial importance to the Indian people." 88 Stat. 2203, as set forth in 25 U. S. C. § 450(b)(3).

Section 450k empowers the Secretary to promulgate regulations to accomplish the purposes of the Act. 88 Stat. 2212, 25 U. S. C. § 450k. Pursuant to this authority, the Secretary has promulgated detailed and comprehensive regulations respecting "school construction for previously private

---

tion of the Indians entering into this treaty, the necessity of education is admitted."

schools now controlled and operated by tribes or tribally approved Indian organizations." 25 CFR § 274.1 (1981). Under these regulations, the BIA has wide-ranging authority to monitor and review the subcontracting agreements between the Indian organization, which is viewed as the general contractor, and the non-Indian firm that actually constructs the facilities. See 25 CFR § 274.2 (1981).[4] Specifically, the BIA must conduct preliminary on-site inspections, and prepare cost estimates for the project in cooperation with the tribal organization. 25 CFR § 274.22 (1981). The Board must approve any architectural or engineering agreements executed in connection with the project. 25 CFR § 274.32(c) (1981). In addition, the regulations empower the BIA to require that all subcontracting agreements contain certain terms, ranging from clauses relating to bonding and pay scales, 41 CFR § 14H–70.632 (1981), to preferential treatment for Indian workers. 25 CFR § 274.38 (1981). Finally, to ensure that the Tribe is fulfilling its statutory obligations, the regulations require the tribal organization to maintain records for the Secretary's inspection. 25 CFR § 274.41 (1981).

This detailed regulatory scheme governing the construction of autonomous Indian educational facilities is at least as comprehensive as the federal scheme found to be pre-emptive in *White Mountain*.[5] The direction and supervision pro-

---

[4] Although these regulations did not become effective until several months after the BIA and the Board had executed the initial contracts, the Secretary and the BIA had applied similar requirements under the authority of the Johnson-O'Malley Act, 48 Stat. 596, 25 U. S. C. § 452 *et seq.* In any event, the two subsequent agreements between the BIA, the Board and Lembke, accounting for two-thirds of the total construction, were signed after the effective date of these regulations, which clearly authorize the BIA to monitor these construction agreements.

[5] JUSTICE REHNQUIST asserts that the comprehensive federal regulatory scheme outlined above "do[es] not regulate school construction, which is the activity taxed." *Post*, at 851. The dissent fails to explain, however, how this fact distinguishes this case from *White Mountain*. In that

vided by the Federal Government for the construction of Indian schools leave no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts paid to Lembke by the Board. This burden, although nominally falling on the non-Indian contractor, necessarily impedes the clearly expressed federal interest in promoting the "quality and quantity" of educational opportunities for Indians by depleting the funds available for the construction of Indian schools.[6]

---

case, we struck down Arizona's use fuel tax and motor carrier license tax, not because of any federal interest in gasoline, licenses, or highways, but because the imposition of these state taxes on a non-Indian contractor doing work on the reservation was pre-empted by the "comprehensive regulation of the harvesting and sale of tribal timber." 448 U. S., at 151. We find that New Mexico is similarly precluded from impeding the federal interest in the construction of autonomous Indian educational institutions by imposing its gross receipts tax on Lembke. JUSTICE REHNQUIST's contention that the New Mexico tax is somehow compatible with this federal interest because such taxes "are as much a normal cost of school construction as the cost of cement and labor," post, at 855, is also foreclosed by White Mountain. Surely, state use fuel and motor carrier license taxes are considered part of the cost of harvesting and marketing timber. Yet in White Mountain, we concluded that these taxes impeded the federal interest in "guaranteeing Indians that they will 'receive . . . the benefit of whatever profit [the forest] is capable of yielding,'" 448 U. S., at 149, despite the dissent's argument that the taxes amounted to less than 1% of the annual profits produced by the logging operation. Here, as in White Mountain, JUSTICE REHNQUIST continues to press this argument.

[6] Appellee would have us impute congressional awareness and approval of the state gross receipts tax from appropriations bills which earmarked funds for the construction of these facilities, see n. 2, supra. Brief for Appellee 21–22. Appellee strains to find this awareness and approval by arguing that the same architects who prepared the cost estimates and requests that the Board submitted to Congress also prepared the bid specifications pursuant to which Lembke submitted its bid. However, as we have indicated, the bid specifications only required prospective bidders to include "all taxes required by law," and the submitted bids did not specify the gross receipts tax as a separate line item. Supra, at 835. Therefore, it is by no means clear, and the Board disputes the contention, that the Board ever intended to have these state taxes included in the construction costs of its school facilities. Furthermore, there is absolutely no

The Bureau of Revenue argues that imposition of the state tax is not pre-empted because the federal statutes and regulations do not specifically express the intention to pre-empt this exercise of state authority. This argument is clearly foreclosed by our precedents. In *White Mountain* we flatly rejected a similar argument. 448 U. S., at 150–151 (citing *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685 (1965); *Williams* v. *Lee,* 358 U. S. 217 (1959); and *Kennerly* v. *District Court of Montana,* 400 U. S. 423 (1971)). There is nothing unique in the nature of a gross receipts tax or in the federal laws governing the development of tribal self-sufficiency in the area of education that requires a different analysis.

In this case, the State does not seek to assess its tax in return for the governmental functions it provides to those who must bear the burden of paying this tax. Having declined to take any responsibility for the education of these Indian children, the State is precluded from imposing an additional burden on the comprehensive federal scheme intended to provide this education—a scheme which has "left the State with no duties or responsibilities." *Warren Trading Post Co.* v. *Arizona Tax Comm'n, supra,* at 691.[7] Nor has the State asserted any specific, legitimate regulatory interest to justify the imposition of its gross receipts tax. The only arguably

---

indication that Congress was even made aware of the existence of these taxes when it appropriated funds for the construction of the Ramah Navajo school. In any event, as we have noted in a related context, courts should be wary of inferring congressional intent to alter the force of existing law from an appropriations Act. Cf. *TVA* v. *Hill,* 437 U. S. 153, 189–191 (1978).

[7] Of course, these statutes and regulations do not prevent the States from providing for the education of Indian children within their boundaries. Indeed, the Self-Determination Act specifically authorizes the Secretary to enter into contracts with any State willing to construct educational institutions for Indian children on or near the reservation. 88 Stat. 2214, 25 U. S. C. § 458. This case would be different if the State were actively seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for Ramah Navajo children.

specific interest advanced by the State is that it provides services to *Lembke* for its activities *off the reservation.* This interest, however, is not a legitimate justification for a tax whose ultimate burden falls on the tribal organization.[8] Furthermore, although the State may confer substantial benefits on Lembke as a state contractor, we fail to see how these benefits can justify a tax imposed on the construction of school facilities *on tribal lands* pursuant to a contract between the tribal organization and the non-Indian contracting firm.[9] The New Mexico gross receipts tax is intended to compensate the State for granting "the privilege of engaging in business." N. M. Stat. Ann. §§ 7–9–3(F) and 7–9–4(A) (1980). New Mexico has not explained the source of its power to levy such a tax in this case where the "privilege of doing business" on an Indian reservation is exclusively bestowed by the Federal Government.

---

[8] The Bureau of Revenue invites us to adopt the "legal incidence" test, under which the legal incidence and not the actual burden of the tax would control the pre-emption inquiry. Of course, in some contexts, the fact that the legal incidence of the tax falls on a non-Indian is significant. See *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 150–151 (1980); *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976). However, in *White Mountain,* 448 U. S., at 151, we found it significant that the economic burden of the asserted taxes would ultimately fall on the Tribe, even though the legal incidence of the tax was on the non-Indian logging company. Given the comprehensive federal regulatory scheme at issue here, we decline to allow the State to impose additional burdens on the significant federal interest in fostering Indian-run educational institutions, even if those burdens are imposed indirectly through a tax on a non-Indian contractor for work done on the reservation.

[9] In *Central Machinery Co.* v. *Arizona State Tax Comm'n,* 448 U. S. 160 (1980), we held that the Indian trader statutes, 19 Stat. 200, 25 U. S. C. § 261 *et seq.,* pre-empted the State's jurisdiction to tax the sale of farm machinery to the Indian Tribe, notwithstanding the substantial services that the State undoubtedly provided to the off-reservation activities of the non-Indian seller. Presumably, the state tax revenues derived from Lembke's off-reservation business activities are adequate to reimburse the State for the services it provides to Lembke.

The State's ultimate justification for imposing this tax amounts to nothing more than a general desire to increase revenues. This purpose, as we held in *White Mountain*, 448 U. S., at 150, is insufficient to justify the additional burdens imposed by the tax on the comprehensive federal scheme regulating the creation and maintenance of educational opportunities for Indian children and on the express federal policy of encouraging Indian self-sufficiency in the area of education.[10] This regulatory scheme precludes any state tax that "stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941).

## C

The Solicitor General, in an *amicus* brief filed on behalf of the United States, suggests that we modify our pre-emption analysis and rely on the dormant Indian Commerce Clause, Art. I, § 8, cl. 3, to hold that on-reservation activities involving a resident tribe are presumptively beyond the reach of state law even in the absence of comprehensive federal regulation, thus placing the burden on the State to demonstrate that its intrusion is either condoned by Congress or justified by a compelling need to protect legitimate, specified state interests other than the generalized desire to collect revenue. He argues that adopting this approach is preferable for several reasons: it would provide guidance to the state courts addressing these issues, thus reducing the need for our case-by-case review of these decisions; it would avoid the tension

---

[10] We are similarly unpersuaded by the State's argument that the significant services it provides to the Ramah Navajo Indians justify the imposition of this tax. The State does not suggest that these benefits are in any way related to the construction of schools on Indian land. Furthermore, the evidence introduced below by the State on this issue is far from clear. Although the State does provide services to the Ramah Navajo Indians, it receives federal funds for providing some of these services, and the State conceded at trial that it saves approximately $380,000 by not having to provide education for the Ramah Navajo children. App. 95, 105–106, 108.

created by focusing on the pervasiveness of federal regulation as a principal barrier to state assertions of authority when the primary federal goal is to encourage tribal self-determination and self-government; and it would place a higher burden on the State to articulate clearly its particularized interests in taxing the transaction and to demonstrate the services it provides in assisting the taxed transaction.

We do not believe it necessary to adopt this new approach—the existing pre-emption analysis governing these cases is sufficiently sensitive to many of the concerns expressed by the Solicitor General. Although clearer rules and presumptions promote the interest in simplifying litigation, our precedents announcing the scope of pre-emption analysis in this area provide sufficient guidance to state courts and also allow for more flexible consideration of the federal, state, and tribal interests at issue. We have consistently admonished that federal statutes and regulations relating to tribes and tribal activities must be "construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence." *White Mountain, supra,* at 144; see also *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 174–175, and n. 13; *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S., at 690–691. This guiding principle helps relieve the tension between emphasizing the pervasiveness of federal regulation and the federal policy of encouraging Indian self-determination. Although we must admit our disappointment that the courts below apparently gave short shrift to this principle and to our precedents in this area, we cannot and do not presume that state courts will not follow both the letter and the spirit of our decisions in the future.

## III

In sum, the comprehensive federal regulatory scheme and the express federal policy of encouraging tribal self-sufficiency in the area of education preclude the imposition of the

state gross receipts tax in this case. Accordingly, the judgment of the New Mexico Court of Appeals is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE WHITE and JUSTICE STEVENS join, dissenting.

The Court today reproves the New Mexico Court of Appeals for failing to heed our precedents, much as a disappointed parent would rebuke a wayward child.[1] I do not think the Court of Appeals deserves the rebuke; it seems to me that the state court applied our precedents at least as faithfully, and coherently, as the Court itself. In its desire to reach a result that it evidently finds quite salutary as a matter of policy, the Court finds "indistinguishable" a case that is considerably off the mark, and it finds "pervasively regulated" an activity that is largely free of federal regulation. It ultimately accords a dependent Indian tribal organization greater tax immunity than it accorded the sovereignty of the United States a short three months ago in a case involving the precise state taxes at issue here.

I

The general question presented by this case has occupied the Court many times in the recent past, and seems destined to demand its attention over and over again until the Court sees fit to articulate, and follow, a consistent and predictable rule of law. This insistent question concerns the extent to which the States can tax economic activity on Indian reservations within their borders. I believe the dominant trend of

---

[1] "Although we must admit our disappointment that the courts below apparently gave short shrift to this principle and to our precedents in this area, we cannot and do not presume that state courts will not follow both the letter and the spirit of our decisions in the future." *Ante,* at 846.

our cases is toward treating the scope of reservation immunity from nondiscriminatory state taxation as a question of pre-emption, ultimately dependent on congressional intent. In such a framework, the tradition of Indian sovereignty stands as an independent barrier to discriminatory taxes, and otherwise serves only as a guide to the ascertainment of the congressional will.

The principles announced in *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136 (1980), are consistent with this trend.[2]  Thus, the Court in *White Mountain* recognized federal pre-emption as a principal barrier to the assertion of state regulatory authority over tribal reservations and members, *id.*, at 142, and specifically invalidated the challenged assertion of taxing authority on that basis, *id.*, at 148, 151, n. 15.  The Court also recognized that in some instances a state law may be invalid because it infringes "'the right of reservation Indians to make their own laws and be ruled by them.'"  *Id.*, at 142 (quoting *Williams* v. *Lee*, 358 U. S. 217, 220 (1959)).  But apart from those rare instances in which the State attempts to interfere with the residual sovereignty of a tribe to govern its own members, the "tradition of tribal sovereignty" merely provides a "backdrop" against which the pre-emptive effect of federal statutes or treaties must be assessed.  See 448 U. S., at 143.

The Court today pays homage to these principles but then promptly bestows its favors on a new analytical framework in which the extent of economic burden on the tribe, and not the pre-emptive effect of federal regulations, appears to be the paramount consideration.  Such a shift is necessary, for the

---

[2] Nevertheless, the Solicitor General has again suggested that on-reservation activities affecting resident tribes be considered presumptively beyond the reach of state law by operation of the "principle of tribal sovereignty."  See Brief for United States as *Amicus Curiae* 17–24.  The same suggestion was urged, and rejected, in *White Mountain*.  It has proved no more appealing in this case.

Court's purported reliance on *White Mountain* will not withstand even superficial scrutiny.

## II

The Court declares that "[t]his case is indistinguishable in all relevant respects from *White Mountain.*" *Ante,* at 839. This statement is quite inaccurate. *White Mountain* involved an attempt by the State of Arizona to apply its motor carrier license and use fuel taxes to the logging operations of a non-Indian company doing business exclusively on the reservation. The Court concluded that application of the State's taxes was inconsistent with the pervasive federal regulation of the very activity subject to taxation. The Court repeatedly emphasized the comprehensiveness of the regulations on which it relied.

> "Under these regulations, the Bureau of Indian Affairs exercises literally daily supervision over the harvesting and management of tribal timber. In the present case, contracts between [the tribal organization] and [the non-Indian contractor] must be approved by the Bureau; indeed, the record shows that some of those contracts were drafted by employees of the Federal Government. Bureau employees regulate the cutting, hauling, and marking of timber by [the tribal organization and the contractor]. The Bureau decides such matters as how much timber will be cut, which trees will be felled, which roads are to be used, which hauling equipment [the contractor] should employ, the speeds at which logging equipment may travel, and the width, length, height, and weight of loads.

> "The Secretary has also promulgated detailed regulations governing the roads developed by the Bureau of Indian Affairs. . . . On the Fort Apache Reservation the Forestry Department of the Bureau has required [the tribal organization] and its contractors . . . to repair and

maintain existing Bureau and tribal roads and in some cases to construct new logging roads. . . . A high percentage of [the contractor's] receipts are expended for those purposes, and it has maintained separate personnel and equipment to carry out a variety of tasks relating to road maintenance." 448 U. S., at 147–148.

But the Court in *White Mountain* did not merely review the comprehensiveness of the regulations and conclude, *ipso facto*, that state taxes on the logging operations were preempted. It found, with considerable attention to specifics, that "the assessment of state taxes would obstruct federal policies." *Id.*, at 148.

"At the most general level, the taxes would threaten the overriding federal objective of guaranteeing Indians that they will 'receive . . . the benefit of whatever profit [the forest] is capable of yielding. . . .' 25 CFR § 141.3(a)(3) (1979). Underlying the federal regulatory program rests a policy of assuring that the profits derived from timber sales will inure to the benefit of the Tribe subject only to administrative expenses incurred by the Federal Government. . . .

"In addition, the taxes would undermine the Secretary's ability to make the wide range of determinations committed to his authority concerning the setting of fees and rates with respect to the harvesting and sale of tribal timber. The Secretary reviews and approves the terms of the Tribe's agreements with its contractors, sets fees for services rendered to the Tribe by the Federal Government, and determines stumpage rates for timber to be paid to the Tribe. Most notably in reviewing or writing the terms of the contracts between [the tribal organization] and its contractors, federal agents must predict the amount and determine the proper allocation of all business expenses, including fuel costs. The assessment of state taxes would throw additional

factors into the federal calculus, reducing tribal revenues and diminishing the profitability of the enterprise for potential contractors.

"Finally, the imposition of state taxes would adversely affect the Tribe's ability to comply with the sustained-yield management policies imposed by federal law." *Id.*, at 149–150.

As noted, the Court thinks that this case is "indistinguishable in all relevant respects from *White Mountain.*" *Ante*, at 839. It finds that "[f]ederal regulation of the construction and financing of Indian educational institutions is both comprehensive and pervasive." *Ibid.* But the regulations on which the Court relies do not regulate school construction, which is the activity taxed. They merely detail procedures by which tribes may apply for federal funds in order to carry out school construction.

The purpose of the regulations, which the Court quotes only in part, *ante*, at 840–841, "*is to give the application and approval process for obtaining a contract or services from the Bureau* for school construction for previously private schools now controlled and operated by tribes or tribally approved Indian organizations . . . ." 25 CFR § 274.1 (1981) (emphasis added). The regulations that follow explain the procedures by which tribes may obtain, complete, and file application forms for federal funding or services. §§ 274.12–274.18. As the Court observes, *ante*, at 841, the regulations also authorize the BIA to approve or disapprove plans and specifications for construction as well as construction contracts let by the tribe, which are treated as subcontracts of the funding contract between the tribe and the BIA. The contracts are required to contain a clause establishing a hiring preference for Indians. § 274.38. And the BIA is given access to the tribe's records for auditing purposes. § 274.41. That is the extent of the regulations.

In this case the BIA "contracted" with the School Board in order to convey federal funds for the construction project.

It also approved the Board's construction "subcontract" with the construction contractor. It played *no role* in the selection of the contractor and it played *no role* in regulating or supervising the actual construction of the school. The Court concludes that this scheme, which is little more than a grant application process, "is at least as comprehensive as the federal scheme found to be pre-emptive in *White Mountain.*" *Ante*, at 841. I simply cannot agree.

More important, the Court concludes in the very next sentence that "[t]he direction and supervision provided by the Federal Government for the construction of Indian schools leaves no room for the additional burden sought to be imposed by the State through its taxation of the gross receipts paid to Lembke by the Board." *Ante*, at 841–842. This statement constitutes the sum total of the Court's preemption analysis in this case. In *White Mountain* the Court engaged in a detailed examination of the extent to which state taxes would interfere both with the Secretary's ability to carry out his congressional mandate and with the tribe's ability to carry out federal policy. In the place of such careful analysis, the Court today relies on *ipse dixit*. It does so because there is no realistic basis for concluding that the State's taxes would interfere with a "pervasive" regulatory scheme. The BIA simply does not regulate the construction activity which the State seeks to tax. It provides federal money to eligible tribes and tribal organizations and it establishes a contract-approval and auditing mechanism as a means of attempting to ensure that the money is put to the use for which it is earmarked.[3]

---

[3] The Court ignores other distinctions between this case and *White Mountain*. For example, the logging contractor in the latter case, although a non-Indian corporation, operated exclusively to harvest timber on the reservation; it conducted no off-reservation activities whatsoever. See 448 U. S., at 139. The contractor in this case is a general building contractor doing business throughout the State of New Mexico, and enjoying state services to the same extent as any other commercial enterprise in

## III

A careful reading of the Court's opinion demonstrates that the single, determinative factor in its judgment is the fact that the challenged state taxes have increased the financial burden of constructing a tribal school. Whether the federal regulations are detailed and comprehensive or largely a matter of bookkeeping is an irrelevancy, for the Court concludes that the tax burden "impedes the clearly expressed federal interest in promoting the 'quality and quantity' of educational opportunities for Indians *by depleting the funds available for the construction of Indian schools.*" *Ante*, at 842 (emphasis added). The Court recognizes that the legal incidence of the tax is on the non-Indian contractor, but asserts that "in *White Mountain* . . . we found it significant that the economic burden of the asserted taxes would ultimately fall on the Tribe,

---

New Mexico. The Court dismisses this factor with the statement that "[p]resumably, the state tax revenues derived from Lembke's off-reservation business activities are adequate to reimburse the State for the services it provides to Lembke." *Ante*, at 844, n. 9. The Court's "presumptions," however, are no substitute for the considered judgment of the state taxing authority. Indeed, in assessing the validity of a state tax, the Court has previously recognized that the State's interests are strongest when the taxpayer is the recipient of state services. See *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134, 157 (1980). To the extent presumptions are relevant, the Court has inverted the one that ought to apply.

Another distinction is also relevant. The activity taxed in *White Mountain* was the exploitation of natural resources located on the reservation and devoted to the beneficial use and enjoyment of reservation Indians. Indeed, over 90% of the total profits generated by tribal enterprises were derived from the Tribe's logging operations. 448 U. S., at 138. In this case, the state taxes diminish, not the income generated by the Tribe for its own preservation and welfare, but federal funds appropriated by Congress for the purpose of school construction. No tribal funds are devoted to this endeavor, and congressional appropriations were based on funding requests that included the gross receipts tax as part of the estimated construction cost.

even though the legal incidence of the tax was on the non-Indian logging company." *Ante*, at 844, n. 8.

The Court in *White Mountain* did indeed note that "the economic burden of the asserted taxes will ultimately fall on the Tribe." 448 U. S., at 151. But in a footnote immediately following that sentence, which is today ignored, the Court declared:

> "Of course, the fact that the economic burden of the tax falls on the Tribe does not by itself mean that the tax is pre-empted, as *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), makes clear. Our decision today is based on the pre-emptive effect of the comprehensive federal regulatory scheme, which . . . leaves no room for the additional burdens sought to be imposed by state law." *Id.*, at 151, n. 15.

Despite its references to the supposed "comprehensive and pervasive" regulatory scheme in this case, the Court clearly has chosen to bar the State from taxing Lembke's gross receipts principally because the tax imposes an indirect economic burden on the tribal organization. As the Court in *White Mountain* recognized, our precedents undeniably view that as an insufficient basis for the recognition of an Indian tax immunity. See *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 156 (1980) ("Washington does not infringe the right of reservation Indians to 'make their own laws and be ruled by them,' . . . merely because the result of imposing its taxes will be to deprive the Tribes of revenues which they currently are receiving"); *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463, 481–482 (1976) (upholding tax on cigarette sales from Indians to non-Indians because the legal incidence of the tax was on the consumer); *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 156–157 (1973) (refusing to imply tax immunity despite economic burden on tribal enterprise).[4] Even under the

---

[4] In other areas of tax immunity, the Court has steadfastly refused to assess the validity of a tax by reference to the economic burdens it imposes if

modified form of pre-emption doctrine applicable to state regulation of reservation activities, there must be some affirmative indication that Congress did not intend the State to exercise the sovereign power challenged in the suit. Until today, the mere fact that the asserted power will impose an economic burden on a tribal endeavor has not provided that affirmative indication.

I do not disagree with the Court's judgment that congressional enactments such as the Indian Financing Act and the Indian Self-Determination and Education Assistance Act embody a federal policy encouraging the development of Indian-controlled educational institutions. But it is a considerable leap to infer from that policy the independent principle that all state laws which might increase the cost of such an endeavor are to be considered null and void. It is perfectly conceivable that Congress favored Indian education, but also contemplated that all costs of obtaining that end would be paid in a normal fashion. State taxes are as much a normal cost of school construction as the cost of cement and labor. The cost of taxes was included in the bids submitted to the Board by the construction contractors, and it apparently was also included in the funding requests submitted by the Board to Congress. The Board cannot be faulted for attempting to stretch its federal construction funds as far as possible, but that is a woefully inadequate basis for interfering with the sovereign prerogatives of the State of New Mexico.

## IV

A short three months ago, this Court considered whether the State of New Mexico could impose its gross receipts and

---

those burdens are nondiscriminatory and comport with due process. See *United States* v. *New Mexico*, 455 U. S. 720 (1982) (state taxation of federal contractors); *United States* v. *County of Fresno*, 429 U. S. 452 (1977) (state taxation of Federal Government); *New York* v. *United States*, 326 U. S. 572 (1946) (federal taxation of state government); *Michelin Tire Corp.* v. *Wages*, 423 U. S. 276 (1976) (state taxation of imports and exports).

compensating use taxes on private contractors that conduct business with the Federal Government. We concluded that tax immunity was appropriate in only one circumstance: "when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned." *United States* v. *New Mexico*, 455 U. S. 720, 735 (1982). In reaching this conclusion, we held that "immunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire economic burden of the levy." *Id.*, at 734. If the legal incidence of the tax is on the contractor, it is to be considered valid, absent specific congressional action, as long as "the contractors can realistically be considered entities independent of the United States." *Id.*, at 738.[5]

In this case, as in *United States* v. *New Mexico*, the legal incidence of the New Mexico tax is on the private contractor, not on the entity whose status might be the source of a tax immunity. And, as in *United States* v. *New Mexico*, it is evident that Lembke is a separate taxable entity completely independent of the tribal school board. Were the tax immunity of the Tribe no greater than that of the United States, it seems plain that New Mexico's tax would have to be upheld as applied to the gross receipts of the non-Indian contractor. But the Court reaches a different conclusion because it finds that the tax imposes an economic burden on the Tribe's effort to build a school with federal funds. Thus, the Court accords

---

[5] We recognized one possible exception to this general rule: "In the case of a sales tax . . . it is arguable that an entity serving as a federal procurement agent can be so closely associated with the Government, and so lack an independent role in the purchase, as to make the sale—in both a real and a symbolic sense—a sale to the United States, even though the purchasing agent has not otherwise been incorporated into the Government structure." 455 U. S., at 742. In this case, there is no basis for arguing that Lembke has acted merely as a purchasing agent for the Board or the BIA.

an Indian Tribe, whose sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance," *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978), greater immunity from state taxes than is enjoyed by the sovereignty of the United States on whom it is dependent.[6]

For these reasons, I dissent from the Court's judgment.

---

[6] Of course, the Court purports to rest its decision on the pre-emptive effect of federal law. But the immunity of federal contractors from state taxes is also dependent on "generalized notions of federal supremacy." *United States* v. *New Mexico, supra,* at 730. The critical question, both in *United States* v. *New Mexico* and in this case, is what factors will the Court examine to determine whether the State has exceeded limits imposed by the Supremacy Clause and by Congress. I think it is evident that in the area of federal tax immunity the Court has required evidence of more than mere economic burdens before it will invalidate a state tax as applied. As this case demonstrates, tribal tax immunity may be invoked on no greater showing than the fact of economic burdens on a federally supported tribal endeavor. Since both immunities derive from precisely the same source—the supremacy of federal law—I find the Court's decision today inexplicable. "With the abandonment of the notion that the economic—as opposed to the legal—incidence of the tax is relevant, it becomes difficult to maintain that federal tax immunity is designed to insulate federal operations from the effects of state taxation." *United States* v. *New Mexico, supra,* at 735, n. 11.