824 F.2d 684
 MARTY INDIAN SCHOOL BOARD, INC., a subdivision of the
Yankton Sioux Tribe; and the Yankton Sioux Tribe,
Appellants,
v.
STATE OF SOUTH DAKOTA; R. Van Johnson, Director of the
South Dakota Department of Revenue; and Harvey
Weisser, d/b/a Weisser Oil Co., Appellees.
 No. 86-5449.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 13, 1987.
Decided July 31, 1987.
 
 1
 Michael Abourezk, Gregory, S.D., for appellants.
 
 
 2
 Janice Waysman, Pierre, S.D., for State of South Dakota Dept. of Revenue.
 
 
 3
 Kenneth W. Cotton, Wagner, S.D., for Harvey Weisser.
 
 
 4
 Before LAY, Chief Judge, HEANEY, Circuit Judge, and LARSON,* Senior District Judge.
 
 
 5
 LARSON, Senior District Judge.
 
 
 6
 Plaintiff Marty Indian School Board administers a boarding school for Indian children on the Yankton Sioux Reservation. The Board is composed exclusively of members of the Yankton Sioux Tribe. Funding for the school comes from the federal government through the Indian Self-Determination and Education Assistance Act, 25 U.S.C. Secs. 450, et seq., and through other federal programs, and, as such, is governed by extensive federal regulations and supervision by the Bureau of Indian Affairs. See 25 C.F.R. Secs. 271, et seq.
 
 
 7
 The Board and the Tribe have appealed from the district court's judgment that the State of South Dakota may impose its motor fuel tax on fuel purchased and used by the school exclusively for educational purposes. We agree with the plaintiffs that federal law preempts imposition of the state's fuel tax, and accordingly we reverse the decision of the district court.
 
 I. Background
 
 8
 Plaintiff Marty Indian School, formally known as Marty Indian School Board, Inc., is a nonprofit corporation formed by the Yankton Sioux Tribe to operate the Marty Indian School. The school operates on approximately ten acres of land within "Indian country" as a self-contained community on the Yankton Sioux Reservation. See 18 U.S.C. Sec. 1151. In addition to educational classroom and recreational facilities, the school has several dormitories, eating facilities, an infirmary, and housing for teachers and other school personnel. The school utilizes approximately 35 vehicles, most of which are used for transporting students, for support of the physical facilities of the school such as for snow removal, etc., and for other school business. A few of the vehicles are operated off-road, such as a road grader and back-hoes. Many of the vehicles belong to and are licensed by the federal government. The school purchases fuel for its vehicles from Weisser Oil Co., and stores the fuel in tanks located on the school's premises. These premises are held in trust by the United States for the benefit of the Yankton Sioux Tribe. When school vehicles travel off the premises, they refuel at commercial gas stations and pay the motor fuel tax on these purchases.
 
 
 9
 Since December 1, 1983, however, the school has refused to pay the motor fuel tax on the fuel it purchases from Weisser Oil Company. South Dakota law requires Weisser, as an agent of the state, to collect from its customers and pay to the state the 13cents per gallon motor fuel tax, see South Dakota Codified Laws Sec. 10-47-19, and Weisser has continued to pay the tax. As of the date of trial, Weisser had paid the state $7,809.16 in motor fuel tax on 60,070 gallons of fuel purchased by the school.
 
 
 10
 The school brought the instant action against the State of South Dakota, seeking a declaration that it is exempt from the state motor fuel tax. Weisser counterclaimed, seeking to recover the amount of tax levied on its sales to the school either from the school or from the state. The district court held that the state was justified in imposing the tax by virtue of its expenditures on state highway construction and maintenance in the reservation area, although the court determined that the school need not pay the tax on fuel used within Indian country (1) for off-road purposes or (2) on roads not constructed or maintained by the state. The court ordered the school to pay the tax on all fuel purchased from Weisser and seek a refund from the state for those portions of fuel which the court held exempt from the tax.
 
 
 11
 The school and the Tribe have appealed. After carefully examining the relative interests of the Tribe, the school, the state, and the federal government, we find that federal and tribal interests in Indian education and self-determination outweigh the state's interest in imposing the tax on the school in this case.[1]
 
 II. Preemption and Tribal Self-Determination
 
 12
 As the district court properly recognized, two Supreme Court decisions guide our analysis. In White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), the Court held that the State of Arizona's motor carrier license and motor fuel taxes could not be imposed on a logging enterprise operating within Indian country on the Fort Apache Reservation. The Court stated that while "[g]eneralizations on this subject have become ... treacherous," several basic principles must be considered to determine the boundaries between state regulatory authority and tribal self-government. Id. at 141, 100 S.Ct. at 2582. See Ramah Navajo School Board, Inc. v. Bureau of Revenue, 458 U.S. 832, 837, 102 S.Ct. 3394, 3398, 73 L.Ed.2d 1174 (1982).
 
 
 13
 In White Mountain, the tribal and federal interests involved stemmed from the broad power of Congress to regulate tribal affairs under the Indian Commerce Clause, Art. 1, Sec. 8, cl. 3, and from the "semi-independent position" of Indian tribes. White Mountain, 448 U.S. at 142, 100 S.Ct. at 2583. The Court explained:
 
 
 14
 This congressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law.... Second, it may unlawfully infringe "on the right of reservation Indians to make their own laws and be ruled by them.".... The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress. Even so, traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important "backdrop" ... against which vague or ambiguous federal enactments must always be measured.
 
 
 15
 Id. at 142-43, 100 S.Ct. at 2583 (citations omitted). Federal statutes and regulations thus must be generously construed in order to comport with the strong tradition and national policy of promoting tribal self-sufficiency. Id. at 143-44, 100 S.Ct. at 2583-84; Ramah Navajo School Board, Inc. v. Bureau of Revenue, 458 U.S. at 837-38, 846, 102 S.Ct. at 3398, 3402.
 
 
 16
 Turning to the particular facts before it, the White Mountain Court found a long and comprehensive federal interest in the harvesting of Indian timber, which would be obstructed by the imposition of the state's taxes, primarily because payment of the tax would decrease the amount of revenue available to the Tribe. 448 U.S. at 145-50, 100 S.Ct. at 2584-87. The Court concluded that the state's generalized interest in raising revenue was not sufficient to overcome the federal and tribal interests in guaranteeing that profits derived from the timber sales (1) would inure to the benefit of the Tribe, (2) could be determined solely by the Secretary of the Interior for the benefit of the Tribe, and (3) would be available for payment of federally required sustained yield management policies. Id. at 149-51, 100 S.Ct. at 1586-87. While the imposition of a financial burden on the Tribe did not alone justify preemption, such a burden, in the context of the comprehensive federal regulatory scheme for timber harvesting, simply was not permissible. Id. at 151 n. 15, 100 S.Ct. at 2588 n. 15.
 
 
 17
 The Court reached the same conclusion in Ramah Navajo School Board, Inc. v. Bureau of Revenue, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), in connection with the federal interest in Indian education, also present in the case at bar. In Ramah, New Mexico had sought to impose its gross receipts tax on funds provided by the Bureau of Indian Affairs and paid by the Ramah Navajo School Board for the construction of a school on the reservation for Indian children.
 
 
 18
 Noting that the federal concern with Indian education stemmed from the first treaties between the United States and the Navajo Tribe, the Court found current federal policy strongly encouraged the development of Indian-controlled institutions on the reservation. Id. at 839-40, 102 S.Ct. at 3399. See The Indian Self-Determination and Education Assistance Act, 25 U.S.C. Secs. 450, et seq. The Court stated:
 
 
 19
 The Self-Determination Act declares that a "major national goal of the United States is to provide the quantity and quality of educational services and opportunities which will permit Indian children to compete and excel in the life areas of their choice, and to achieve the measure of self-determination essential to their social and economic well-being." 88 Stat. 2203, as set forth in 25 U.S.C. Sec. 450a(c). In achieving this goal, Congress expressly recognized that "parental and community control of the educational process is of crucial importance to the Indian people." 88 Stat. 2203, as set forth in 25 U.S.C. Sec. 450(b)(3).
 
 
 20
 Id. at 840, 102 S.Ct. at 3400.
 
 
 21
 Like the regulatory scheme for logging in White Mountain, the regulatory scheme governing construction of Indian educatlonal facilities left no room for the additional burden sought to be imposed by the state through its gross receipts tax. Id. at 841-42, 102 S.Ct. at 3400-01. The Court found that this burden "necessarily impedes the clearly expressed federal interest in promoting the 'quality and quantity' of educational opportunities for Indians by depleting the funds available for the construction of Indian schools." Id. at 842, 102 S.Ct. at 3401. As in White Mountain, the state's general desire to increase revenues was "insufficient to justify the additional burdens imposed by the tax on the comprehensive federal scheme regulating the creation and maintenance of educational opportunities for Indian children and on the express federal policy of encouraging Indian self-sufficiency in the area of education." Id. at 845, 102 S.Ct. at 3402.
 
 
 22
 Plaintiff Yankton Sioux Tribe, like the Ramah Navajo Tribe, seeks to promote Indian self-determination by creating and operating an Indian school tailored to the needs and goals of the Indian people. See Marty Indian School v. South Dakota, 592 F.Supp. 1236, 1238 (D.S.D.1984). Plaintiff School Board, like the school board in Ramah, is organized as a nonprofit corporation to be operated exclusively by members of the Tribe. Id.; Tr. at 79-80. Approximately 350 students attend the Marty School, which offers classes specifically designed for Indian students; classes which are not available in the public schools in South Dakota. Tr. at 98. Indeed, at least one of the two adjacent public school districts indicated in response to Congressional inquiries that it could not accommodate the Indian students from the district who attended the school. Tr. at 89-91.[2] Moreover, since the Tribe began administering the school through the School Board, the performance of Indian students has improved and the drop-out rate has decreased dramatically. Tr. at 87. The school is funded through the Indian Self-Determination and Education Assistance Act, 25 U.S.C. Secs. 450, et seq., as well as through other federal programs, and use of these funds is closely regulated and monitored by the Bureau of Indian Affairs. See 25 C.F.R. Secs. 271.1, et seq. Many of the vehicles using the fuel sought to be taxed are actually owned and licensed by the federal government.
 
 
 23
 The federal interest in and comprehensiveness of the regulatory scheme for the Marty School is thus identical to that at issue in Ramah. Marty Indian School v. South Dakota, 592 F.Supp. at 1239. Moreover, as in Ramah, imposition of the state motor fuel tax would, to a substantial extent, frustrate the federal interest in providing "the quantity and quality of educational services and opportunities which will permit Indian children ... to achieve the measure of self-determination essential to their social and economic well-being," 25 U.S.C. Sec. 450a(c), by depleting the funds available for the operation of the school. Removing from the Tribe and the Board the choice of how to spend the finite dollars provided by the federal government for school operations also necessarily affects the Tribe's ability to make its own rules and be governed by them, see White Mountain, 448 U.S. at 142, 100 S.Ct. at 2583, and runs contrary to Congress' declaration that "parental and community control of the educational process is of crucial importance to the Indian people." 25 U.S.C. Sec. 450(b)(3).
 
 
 24
 The state argues that its expenditures for road maintenance and construction in the reservation area represent a legitimate regulatory interest which justifies the imposition of the motor fuel tax on the school, but we cannot agree. First, there is no evidence that revenues from the tax are used directly for the benefit of the education of the Indian children who attend the Marty Indian School or for the promotion of Indian self-sufficiency.[3] Moreover, while it is true that the state spends some funds for construction and maintenance of roads in the reservation area, the state also receives funds from the payment of the fuel tax by the Tribe and by the school when it purchases fuel at commercial gas stations during trips outside of the school's premises. In addition, the state receives an extra allotment from the federal government for highway expenditures based on the amount of Indian land within the state. See 23 U.S.C. Sec. 120. Thus, as the Court in Ramah concluded, the services provided by the state in this case do not justify the further imposition of the fuel tax on fuel purchased and stored on the premises of the Marty Indian School. See Ramah, 458 U.S. at 845 n. 10, 102 S.Ct. at 3402, n. 10.
 
 
 25
 Finally, the state contends on appeal that the Buck Act, 4 U.S.C. Secs. 105, et seq., and the Hayden-Cartwright Act, 23 U.S.C. Sec. 104, authorize the tax in this case. The Supreme Court rejected this argument in White Mountain, 448 U.S. at 151-52 n. 16, 100 S.Ct. at 2588 n. 16, and we agree with the district court's determination that section 104 does not support the imposition of the state's motor fuel tax on the Marty Indian School.
 
 III. Conclusion
 
 26
 The issue of preemption calls "for a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." White Mountain, 448 U.S. at 145, 100 S.Ct. at 2584. While the state contends that its interest in imposing its motor fuel sales tax on the Marty Indian School is more compelling than that presented in either the Ramah or the White Mountain cases, in light of the strong federal policy of promoting Indian self-determination and education and the pervasive involvement of the federal government in the operation of the Marty Indian School, we conclude that, as in Ramah and White Mountain, there is no room for the additional burden which the state's tax would impose. Accordingly, we reverse the decision of the district court and hold that South Dakota's motor fuel tax on fuel purchased by the Marty Indian School and stored on the school's premises is preempted by federal law.
 
 
 
 *
 The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 Because we find that federal law preempts the application of South Dakota's motor fuel tax statute, we need not reach the issue of whether Weisser Oil's claim against the school for reimbursement of funds already paid to the state is barred by the doctrine of sovereign immunity. We understand that the state has agreed to refund to Weisser all sums paid since December 1, 1983, should this Court find that the tax on the school is preempted
 
 
 [2]
 The other school district declined to respond to the Congressional inquiry
 
 
 [3]
 The state channels federal library and lunch program funds to the school, but does not itself provide any monies to support the school's programs or operations