761 P.2d 1094

**PEABODY COAL COMPANY, a Delaware corporation, Plaintiff–Appellant,**

v.

**STATE of Arizona and Arizona Department of Revenue, Defendants–Appellees.**

**No. 1 CA–CIV 9317.**

Court of Appeals of Arizona, Division 1, Department A.

May 10, 1988.

Review Denied Oct. 18, 1988.

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears, P.A., by Larry L. Smith, Jeffrey B. Smith, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by Ian A. MacPherson, Chief Counsel, Tax Div., Phoenix, for defendants-appellees.

## OPINION

JACOBSON, Judge.

This appeal concerns whether Arizona can lawfully impose transaction privilege taxes upon Peabody Coal Company (Peabody), a non-Indian coal company, based upon Peabody's sales to non-Indians of the coal it mines entirely from the Navajo and Hopi reservations in Arizona.

### I. BACKGROUND

Peabody is a Delaware corporation with its Arizona headquarters located in Flagstaff, Arizona. Flagstaff is outside the boundaries of any Indian reservation. In 1966, the Navajo and Hopi Tribes and Peabody's predecessor-in-interest entered into two leases pursuant to the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g. Peabody, under these leases, mines coal from Navajo tribal land at the Kayenta Mine and from Navajo–Hopi joint-use tribal land at the Black Mesa Mine. Peabody sells 100% of the Kayenta Mine coal to a consortium of five electrical utility participants—Arizona Public Service Company, Department of Water and Power of the City of·Los Angeles, Nevada Power Company, Salt River Project Agricultural Improvement and Power District, and Tucson Gas and Electric Company. The company sells approximately 99% of the Black Mesa Mine coal to a consortium of four participants—Southern California Edison Company, Department of Water and Power of the City of Los Angeles, Nevada Power Company, and Salt River Project Agricultural Improvement and Power District. The remaining 1% of the Black Mesa Mine coal is distributed free at the mine site to Indians for home-heating purposes.

Arizona has imposed the taxes in question upon Peabody for the privilege of doing business in the state, with the taxes measured by the company's gross receipts or gross income received from these mining operations. Under the agreements with the power consortiums, Peabody is reimbursed in full for the amount of these taxes paid. From July 1, 1970 until December 31, 1979, Peabody paid, without protest, the taxes at issue.[1] From January 1, 1980 through December 31, 1985, Peabody paid these taxes under protest pursuant to A.R.S. § 42–1339(B) (repealed 1986; now § 42–124), and has sought to claim a refund. At the time judgment was entered, the amount in controversy was approximately $42 million.

In 1983, Peabody brought this suit against the state and the Arizona Department of Revenue seeking refund of the taxes paid under protest. Peabody argued that the application of the taxes to its coal-

---

1. The taxes at issue are the transaction privilege tax pursuant to A.R.S. §§ 42–1301 to –1347, the education excise tax pursuant to §§ 42–1361 to –1362 (repealed effective July 1, 1985), and the special excise tax for education under §§ 42–1371 to –1372 (repealed effective July 1, 1985).

mining activities conducted on tribal lands violated principles of federal preemption of state law, infringed upon tribal sovereignty, and violated the commerce clause. U.S. Const. art. 1, § 8, cl. 3. Neither the Navajo nor the Hopi Tribes are parties to this litigation.

Based upon cross-motions for summary judgment, in April 1986, the trial court granted the state's motion. The court found that the policies of the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g, and the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479, as well as the rationale of *Industrial Uranium Co. v. State Tax Comm'n*, 95 Ariz. 130, 387 P.2d 1013 (1963), all supported imposition of the taxes. The court also found that the taxes imposed no burden on the tribes, and caused no infringement upon tribal sovereignty. In fact, the court noted that the taxes directly benefited both tribes, for the reimbursements for taxes Peabody received from the power consortiums contributed to the company's gross revenue, the figure upon which Peabody's royalty payments to both tribes was based. Finally, the trial court noted that the taxes also benefited Peabody, its employees, and the tribes through the mandated expenditure of state funds for health, education and welfare. Thus, the trial court found no preemption, infringement upon tribal sovereignty, or interference with interstate commerce.

Peabody filed a motion for new trial and to reopen under Rule 59(a)(4) and (8), Arizona Rules of Civil Procedure, based primarily on allegedly material new evidence. The new information dealt with a proposed amendment to the transaction privilege tax statutes (which did not pass) which would have provided for the state to share revenue from the taxes with the Hopi and Navajo Tribes, and with documents which purportedly suggested that Navajo Indians were generally opposed to any state taxation within their reservation boundaries. The trial court denied the motion, and this appeal followed.

On appeal, Peabody raises these issues:

1. whether Arizona can impose a privilege tax on an Indian Reservation;

2. whether Arizona's authority to exact these taxes has been preempted or whether such taxes interfere with tribal sovereignty;

3. whether the interstate commerce clause has been violated by the levy of these taxes; and

4. whether the trial court erred when it denied Peabody's motion for new trial and to reopen.

## II. APPLICATION OF TAXES

The three taxes in issue are taxes based upon the privilege of doing business in Arizona, measured by gross income or gross receipts. A.R.S. §§ 42–1306 (formerly § 42–1309), –1361, and –1371; *State Tax Comm'n v. Howard P. Foley Co.*, 13 Ariz. App. 85, 474 P.2d 444 (1970).

Given the basis of the taxes (the privilege of doing business) Peabody initially questions the state's power to impose them, contending that only the federal or tribal governments may grant the prvilege to operate on a reservation. In response to this argument the state relies exclusively upon *Industrial Uranium Co. v. State Tax Comm'n*, 95 Ariz. 130, 387 P.2d 1013 (1963). In our opinion this reliance is not justified—not because the case does not support the state's position, but because the validity of *Industrial Uranium* has been seriously impaired by subsequent decisions of the United States Supreme Court. In *Industrial Uranium*, the Arizona Supreme Court held that the Arizona transaction privilege taxes (the same taxes which are at issue here) could be validly imposed upon a mining company operating within the confines of the Navajo Indian Reservation pursuant to a lease with the tribe and approved by the Secretary of the Interior. In disposing of most of the same arguments raised by Peabody here, the court relied to a great extent upon the applicability of 25 U.S.C. § 398 to the leases in question. This statute specifically provided that the production of minerals from unalloted lands on Indian reservations could be taxed by the state in which they

were located in all respects the same as production from non-Indian reservation lands. With this clear federal legislative enactment, the court did not need to dwell long on the issue of the state's authority to tax mineral production from an Indian reservation.

However, the federal law interpreting the applicability of 25 U.S.C. § 398 has changed since the *Industrial Uranium* decision. In 1984, the Ninth Circuit held in *Blackfeet Tribe of Indians v. Montana*, 729 F.2d 1192 (9th Cir.1984), that 25 U.S.C. § 398 is not applicable to leases entered into by Indian Tribes after comprehensive amendments to the Indian Reorganization Act in the area of mineral leasing were added by the Act of May 11, 1938 (codified as 25 U.S.C. §§ 396a–396g (1976)). The court stated:

> We hold that the 1924 Act's consent to taxation [25 U.S.C. § 398] is inapplicable to the 1938 Act and to leases executed pursuant to its authority.

729 F.2d at 1203. Accordingly, the court struck down Montana's attempt to tax oil and gas producers on the Blackfeet Reservation, who in turn deducted the taxes from royalties payable to the Tribe.[2]

On appeal to the United States Supreme Court in *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985), the Ninth Circuit's opinion was affirmed. The Supreme Court noted that generally the states may tax Indians only when Congress has manifested clearly its consent to taxation and that statutes are construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit. The court then held:

> When the 1924 and 1938 Acts are considered in light of these principles, it is clear that the 1924 Act [25 U.S.C. § 398] does not authorize Montana to enforce its tax statutes with respect to leases issued under the 1938 Act.

2. Contrary to the Montana tax which decreased the Blackfeet Tribe's royalties, the Arizona tax actually increases the Navajo and Hopi Tribes' royalties, as is pointed out later.

471 U.S. at 766, 105 S.Ct. at 2404, 85 L.Ed. 2d at 759–60.

Since the leases involved in *Industrial Uranium* and here were entered into under the 1938 Act, it is apparent that the continuing validity of the holding in *Industrial Uranium* is in serious question. For this reason we pass directly to the merits of Peabody's contentions.

■ Generally, the fact that a non-Indian business activity occurs on an Indian reservation does not necessarily remove the activity from this state's jurisdiction. *See, e.g., Surplus Trading Co. v. Cook*, 281 U.S. 647, 50 S.Ct. 455, 74 L.Ed. 1091 (1930). Moreover, the incident of the tax is on the "privilege" of doing business in the state, as compared to a tax directly on sales or property. *See Arizona State Tax Comm'n v. Garrett Corp.*, 79 Ariz. 389, 291 P.2d 208 (1955). In the limited context of Peabody's "privilege" argument, this business privilege should not fall without the state's jurisdiction, unless other considerations prohibit its application. *Arizona Dep't of Revenue v. Hane Constr. Co.*, 115 Ariz. 243, 564 P.2d 932 (App.1977). Contrary to Peabody's assertion, this "privilege" relates not to the *right* to conduct the business, but to the *benefits* the state bestows on the taxpayer. *See Flagstaff Vend. Co. v. City of Flagstaff*, 118 Ariz. 556, 578 P.2d 985 (1978) (holding that city excise tax could properly be imposed on sales occurring on a state university campus because the on-campus activity received city police and fire protection).

■ When viewed in this context, the initial propriety of the tax does not depend upon whether Arizona can lawfully permit or prohibit [3] Peabody from operating within the confines of the Indian reservations but rather depends upon whether Peabody by its operation on the reservations is the beneficiary of any state revenues, including the taxes sought to be imposed here.

3. No one has seriously contended that the "privilege" involved as the incident of the tax in question rested upon whether Arizona could prohibit a lawful business from operating within its borders.

We therefore consider the benefits that do flow to Peabody. In doing so we note that the state is not required to show a dollar-for-dollar return of tax money in the form of benefits. *See Thomas v. Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898).

For each of the tax years in issue, over 87% of Peabody's employees at each mine were Indians. Therefore, state revenue benefits flowing to Indians of necessity accrue to the company. The record reveals that from fiscal years 1980–1981 through 1984–1985, the state expended almost $120 million for school districts located wholly on the Navajo and Hopi Reservations, and spent almost $215 million (over five times the amount of taxes Peabody is protesting) to support schools located partially on and partially off these two reservations. These figures include only state general fund expenditures, and not federal funds transmitted through the state to schools. The record also shows that key Peabody employees attended these state-supported schools, and that Peabody's controller's children attend public schools in Flagstaff.

While Peabody contends the state is "volunteering" to support these schools, the state is required to provide such assistance to ensure that all school districts have equal funding to provide required educational programs despite different property tax bases. A.R.S. § 15–971. Three county school superintendents stated that local school districts which serve the Navajo and Hopi Tribes "absolutely depend" upon these state equalization payments to provide required education because of inadequate property tax bases upon the reservations.

In addition to state expenditures for schools, the state also spends tax revenues on health and welfare services to benefit Peabody, its employees, and tribal members. The Deputy Director of the Department of Health Services stated that the state spent approximately $720,000 on the Navajo and Hopi Reservations in just two of the years at issue here for programs to combat alcoholism, tuberculosis, and mental illnesses. The administrator of the Office of Planning and Budget Development, Department of Economic Security, indicated that from January 1980 through September 1985, the state spent almost $9 million of state general fund revenues to administer federal programs on the Navajo and Hopi Reservations.

We also note that Peabody's Arizona Division headquarters, where its Arizona business is managed, is on non-Indian land in Flagstaff. Included among its employees and activities at this headquarters are the president of Peabody's Arizona Division, legal counsel, purchasing operations, a director of operations, a director of human resources, a director of engineering, a senior environmental manager, a controller, numerous support staff, and a Peabody Development Company employee working pursuant to a contract for Peabody Coal Company to help with marketing and contract administration. Thus, the company maintains substantial business operations off the reservations that are crucial to its on-reservation work, and there is no contention that these activities are not benefited by state tax revenues. We therefore hold that sufficient benefits flow to Peabody from state revenues to provide the nexus between Arizona and the "privilege" of doing business in Arizona by Peabody.

## III. PREEMPTION/SOVEREIGNTY

■ Peabody next argues that even if a sufficient taxable nexus exists between Peabody and the State of Arizona, the power to levy the taxes has been preempted by federal law, or the exercise of the taxation power interferes with rights of tribal sovereignty. The state asserts that Peabody lacks standing to argue interference with tribal sovereignty rights. We disagree. In *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the United States Supreme Court stated that to determine whether a state tax may be applied to a business performed on Indian reservation land without violating federal law, federal, tribal, and state interests must be analyzed. "These interests tend to erect two 'independent but related' barriers to the exercise of state authority over commercial

activity on an Indian reservation: state authority may be pre-empted by federal law, or it may interfere with the tribe's ability to exercise its sovereign functions." *Id.* at 837, 102 S.Ct. at 3398, 73 L.Ed.2d at 1179; *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). Because the preemption issue cannot be considered without also considering the tribal sovereignty issue Peabody, of necessity, must have standing to raise the issue of interference with tribal sovereignty.

Peabody first argues that the extensive federal and Navajo regulation of its coal-mining activities in and of itself results in a preemption of state law. The state does not really present a solid preemption analysis, focusing on federal, tribal and state interests. Rather, the state urges us to adopt a rule, which it contends is suggested by Indian law cases, that if the burden of a tax legally or economically falls upon Indians or an Indian tribe or enterprise, preemption occurs. If, however, no substantial burden falls upon an Indian or Indian organization, the tax can stand. While this approach may be appealing, and may be the ultimate result in the case law, we are compelled to employ the particularized analysis of interests the United States Supreme Court has applied in such cases.

■ We start with the proposition that in the area of state taxation of on-reservation activities, regular preemption principles do not apply. *White Mountain*, 448 U.S. at 143, 100 S.Ct. at 2583, 65 L.Ed.2d at 672. Rather, when a

> State asserts authority over the conduct of non-Indians engaging in activity on the reservation ... [the court has] examined the language of the relevant federal treaties and statutes in terms of both the broad policies that underlie them and the notions of sovereignty that have developed. [The court then conducts] a particularized inquiry into the nature of the state, federal, and tribal interests at stake ... to determine whether, in the specific context, the exercise of state authority would violate federal law.

*Id.* at 144–45, 100 S.Ct. at 2584, 65 L.Ed.2d at 673.

■ The interrelated federal and tribal interests involved in this case are based both upon the specific laws regulating a coal-mining business and the general federal policies underlying the Indian Reorganization Act of 1934, 25 U.S.C. §§ 461–479, and the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396a–396g. The general policies underlying these two federal Acts are to achieve uniformity in the law governing mineral leases on Indian land, to revitalize tribal government, to encourage economic development of Indian land, and to maximize the economic return to the tribes. *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985); *Crow Tribe of Indians v. Montana*, 819 F.2d 895 (9th Cir.1987).

The numerous federal and tribal laws governing coal mining on reservation lands also demonstrate goals of maximizing benefits to the tribes. Peabody has cited extensive statutes and regulations governing virtually every aspect of its coal-mining activities, from the creation of its leases to the reclamation of land. Peabody's mines are regulated and inspected by the Office of Surface Mining which requires Peabody to submit and gain approval of a complete mining and reclamation plan, with details regarding areas to be mined, productivity, quality, environmental effects on water, air, soil, vegetation and wildlife, and also requires the company to post bonds for reclamation work. Peabody is also subject to general federal laws regarding mine safety, equal employment opportunity, labor relations, and federal contract compliance. Finally, Peabody must pay two Navajo taxes based on its coal-mining activities, business activities and possessory interest taxes, and must work with Navajo and Hopi labor relations offices.

The state does not dispute that federal and Indian regulation of Peabody's activities is comprehensive. However, the state contends that extensive federal regulation alone is not sufficient to lead to preemption of state law, citing *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832,

102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), *Warren Trading Post Co. v. Arizona Tax Comm'n*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), *Central Machinery Co. v. Arizona State Tax Comm'n*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980), and *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980).

Our examination of these and other United States Supreme Court cases demonstrates that while the Court has not articulated a specific preemption/sovereignty test, other than the particularized interests analysis previously mentioned, all cases involved a two-prong inquiry into: (1) whether a sufficient state interest supported imposition of the tax, despite heavy federal regulation of the taxed activity, and (2) how did the tax directly or indirectly impact upon Indians, that is, where did the economic burden of the tax fall as compared to where the legal burden of the tax was initially imposed.

For example, in *Ramah* the Court held that federal law preempted a state tax imposed upon the gross receipts of a non-Indian contractor for construction of a school for Indian children on a reservation where the tax actually was paid by the Indian school board because it was included as a cost of construction in the contractor's bid. Similarly, in *Warren Trading Post*, the court held that Arizona's transaction privilege tax could not be imposed upon trade with Indians. Federal regulation of Indian traders was extensive, the collection of the tax would have frustrated the congressional purpose that no burden be put on traders for trading with Indians, and at the time the case was decided in 1965, the federal government carried the entire burden for constructing and maintaining schools and roads that benefitted Indians, leaving the state no duties towards the Indians related to its taxing function. 380 U.S. at 688–91, 85 S.Ct. at 1244–46, 14 L.Ed.2d at 167–69.

Likewise in *Central Machinery*, which held Arizona's transaction privilege tax was preempted, the Court noted that the tax was paid by the Indians. Without any discussion of the state interests involved,

the Court summarily rejected imposition of the tax.

*White Mountain* also demonstrates the application of the Supreme Court's preemption analysis. Motor carrier license and use fuel taxes were held preempted because: (1) the tribal entity involved reimbursed the logging company for all tax liability incurred based on its on-reservation activities; (2) extensive federal regulations controlled logging activities; (3) the taxes would disrupt federal policies of maximizing return to the Indians and other policies created by federal law; and (4) the state did not impose the tax to help maintain on-reservation roads or forests, because the Indians and logging companies were responsible for those activities.

In applying the perceived two-prong analysis we first note, as has been previously discussed, that the state's expenditure of its revenues on the reservations far exceeds the amount of taxes it seeks to collect from Peabody. We, therefore, hold that Arizona has more than a generalized interest in raising revenues; rather it has an interest associated with governments generally, that is, "seeking tax revenues for the purpose of constructing, or assisting in the effort to provide, adequate educational facilities for [Indian] children." *Ramah*, 458 U.S. at 843 n. 7, 102 S.Ct. at 3401 n. 7, 73 L.Ed.2d at 1183 n. 7.

We next note that rather than these taxes being a burden upon the Indian tribes involved, the taxes enhance their revenues. Because of Peabody's contracts with the power consortiums, the taxes involved here are recovered by Peabody and are included in Peabody's gross realization figure for royalty calculation purposes. In fact, both tribes argued successfully before the Interior Board of Land Appeals of the United States Department of the Interior that these taxes should be included as part of Peabody's gross realization. I.B.L.A. 83–248 (April 29, 1983). Therefore, imposition of these taxes actually furthers the federal and tribal interests by increasing the royalties paid to both tribes.

We therefore hold that the state has demonstrated that its interests in imposing

the transaction privilege and now-repealed education taxes were to provide necessary health, welfare, and education benefits to Peabody's employees and to other tribal members. The fact that Peabody also provides services on the reservations, such as building and upgrading roads and providing health services, does not negate the state's expenditures which benefit Peabody, its employees, and non-employee tribal members. The imposition of these taxes upon Peabody for its coal-mining activities on the Navajo and Hopi Reservations furthers the federal and tribal interests and is supported by sufficient state interests. The trial court correctly held that application of the taxes in this case is not preempted by federal law and does not infringe upon rights of tribal sovereignty.

### IV. COMMERCE CLAUSE

■ Peabody next argues that levying these taxes violates the interstate commerce clause, U.S. Const. art. 1, § 8, cl. 3, by creating an undue burden on interstate commerce. As Peabody and the state agree, "a state tax on activities connected to interstate commerce is sustainable if it 'is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State.'" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 156, 102 S.Ct. 894, 911, 71 L.Ed.2d 21, 41 (1982), quoting *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326, 331 (1977).

Peabody's only argument that application of these taxes violates the commerce clause is that the fourth element of this test has not been met because the "state supplies no services on the reservation to Peabody." The state need not show a direct *quid pro quo* relationship between taxes imposed and benefits supplied. *Thomas v. Gay*, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898). As we have already discussed, the record amply supports the state's assertion that it supplies a variety of necessary educational and health services upon and around the Navajo and Hopi Reservations. These services directly benefit Pea-

body's employees, the vast majority of whom are members of these tribes, and other tribal members. We hold that the application of these taxes in this case does not violate the commerce clause.

### V. NEW TRIAL

■ Finally, Peabody argues that the trial court abused its discretion by refusing to reopen the case and grant a new trial based on allegedly material newly discovered evidence. Rule 59(a)(4), Arizona Rules of Civil Procedure. Peabody sought a new trial based upon a proposed amendment to the transaction privilege tax statutes, and comments of the Navajo Attorney General and the Navajo Tax Commission's Deputy Director which indicated a general opposition to imposition of state taxes to on-reservation activities.

The trial court denied this motion, finding that the evidence was "inadequate and conclusory in nature, legally incorrect in part, and fails to create a genuine issue of material fact or law." The trial court was correct on all counts. The proposed statutory amendment is immaterial as it did not become law. As to the documents purporting to demonstrate the Navajo Tribe's general opposition to the state's exercising its taxing powers within the boundaries of the reservation, these are likewise immaterial. Whether the tribes dislike state taxation in general or did or did not seek intervention in this litigation is of no legal consequence. As we have demonstrated, the validity of these taxes does not depend upon the feelings of any of the parties, but rather upon a legal analysis of the broader interests involved. We find no abuse of discretion by the trial court refusing to grant a new trial.

### VI. CONCLUSION

For the reasons stated, we affirm the trial court's decision in all regards. The state's power to impose its transaction privilege tax and now-repealed special education taxes on Peabody's gross receipts from its on-reservation coal-mining activities has not been preempted, does not inter-

fere with rights of Indian sovereignty, and does not violate the interstate commerce clause. Further, we hold that the trial court did not abuse its discretion by refusing to reopen the case and grant a new trial.

CORCORAN, P.J., and BROOKS, J., concur.