*811 P.2d 345*

**GRANITE CONSTRUCTION COMPANY,
a California corporation,
Plaintiff–Appellant,**

**v.**

**STATE of Arizona, ex rel., ARIZONA
DEPARTMENT OF REVENUE,
Defendant–Appellee.**

No. 1 CA–CV 89–478.

Court of Appeals of Arizona,
Division 1, Department T.

Dec. 18, 1990.

Review Denied June 4, 1991.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Jeffrey B. Smith, Larry L. Smith, Peter C. Guild, Phoenix, for plaintiff-appellant.

Robert K. Corbin, Atty. Gen. by Sandra B. Kelley, Asst. Atty. Gen., Phoenix, for defendant-appellee.

## OPINION

HAIRE, Judge.

Granite Construction Company (Granite) has appealed from an adverse judgment on its claim for a refund of. state transaction privilege taxes and from an order denying its motion for new trial. The appeal presents the following questions: (1) whether 25 U.S.C. § 640d–6 preempts state taxation of gross receipts from contracting services performed for a coal lessee in the Navajo–Hopi Joint Use Area; (2) whether the federally required reclamation work performed at Peabody Coal Company's Kayenta and Black Mesa coal mines constituted "contracting" under former A.R.S. § 42–1301(4) (now see A.R.S. § 42–1310.16(D)(1), (2)); (3) assuming the reclamation work constituted "contracting," were there any genuine issues of material fact concerning whether Granite's participation in the reclamation work constituted "contracting" as opposed to the mere leasing of equipment; and (4) assuming that Granite's reclamation work constituted contracting, was the work performed as a "subcontractor" exempt from taxation pursuant to former A.R.S. § 42–1310(2)(i).

## FACTUAL AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to Granite, *Estate of Kerr*, 137 Ariz. 25, 667 P.2d 1351 (App.1983), the record reveals the following facts. Peabody Coal Company (Peabody) is a Delaware Corporation whose primary business in Arizona is the mining of coal. Peabody is the owner of the leasehold interest under leases with the Navajo and Hopi nations. Peabody strip-mines coal at its Kayenta and Black Mesa Mines on the lands subject to the leases located in the Navajo and Hopi Indian Reservations and Navajo–Hopi Joint Use Area.

The first step in the strip-mining process is to remove the natural vegetation from the area to be mined. The topsoil, which supports plant life, is then stripped and stored in a protected area for later redistribution over an area to be reclaimed. After the topsoil is removed and stored, the "overburden," a layer of soil and rock overlying the coal seams, is removed with a huge piece of machinery called a "dragline." The dragline dumps overburden into the hole created by the dragline's last pass through the strip of land adjacent to the area being mined. The dumping creates pyramid-shaped piles referred to as "spoil piles." Removal of the overburden exposes multiple layers of coal in the coal deposit. The rock strata separating the coal seams are blasted, and the coal is removed with electric shovels.

Pursuant to federal law, strip-mined areas must be "reclaimed." Reclamation comprises recontouring, surface grading, respreading of stored topsoil, and seeding, revegetating and fencing the reclaimed land. The hydrologic balance of the area must also be restored. Peabody owned and operated equipment used for reclamation of strip-mined land. Peabody performed all its own reclamation .work at its smaller mining operations in Montana and Colorado.

Before Granite became involved, Peabody also did all the reclamation work at the Kayenta and Black Mesa Mines. However, in 1978, the Surface Mine Control Reclamation Act became effective and increased the amount of required reclamation work. Rather than purchase an additional three to four million dollars worth of equipment within a short period of time, Peabody estimated from its reclamation plan "the amount of work required that exceeded the amount of equipment that we had, and then put this amount of work out to various companies for bid." Peabody initially awarded the bid to Granite, the lowest bidder.

Granite's initial contract was for two years. Peabody relet the bid every two

years thereafter, and Granite was the successful bidder each time. Granite remained at the Kayenta and Black Mesa Mines from 1974 to July of 1988.

As pertinent to this litigation, the terms of Granite's contract with Peabody were reflected in a letter agreement dated February 15, 1984. Granite was to provide "all supervisory labor, materials, equipment and tools necessary to excavate and dispose of overburden or other similar excavation materials" at the Black Mesa and Kayenta Mines. Peabody was to provide "sufficient personnel to perform all non-supervisory labor as deemed necessary by Contractor [Granite] to perform the work and to operate all the equipment provided." [1] The letter agreement also stated:

> In addition to performing excavation work, Contractor will also provide assistance to Owner [Peabody] in planning and establishing an efficient reclamation program with regard to regrading, topsoiling and revegetation of spoil. Contractor's superintendent and staff will work with Owner's supervisors, engineers and foremen in establishing plans, developing economical techniques and directing Owner's labor and equipment. In the event Owner proposes to contract for spoil leveling, Contractor shall be given the opportunity to submit a bid for such work.

Under the agreement, Granite was to be paid on a per-cubic yard or per-acre basis for excavation work and for managing "owner's labor and equipment," but on a per-operated hour basis for Granite equipment used at the mines. The hourly rates for the equipment were set at the industry level for equipment rented with operators, but the agreement gave Peabody a deduction for the labor costs of its own employees who operated the Granite equipment.

In support of its motion for summary judgment, the Department of Revenue (Department) submitted a promotional article written on Granite's behalf by Robert Cummings, who for a time was Granite's

project superintendent at the Black Mesa and Kayenta Mines. Cummings' article included these statements describing Granite's work for Peabody:

> At this mine a general contractor, acting as subcontractor to the coal company, has put together a management group organized specifically to catch up and maintain an ongoing reclamation program. The project superintendent, essentially acting as the construction manager, was responsible for keeping the wheel rolling. The team saw to it that schedules were adhered to, that responsible individuals made their decisions in a timely fashion, that costs were held in control, and that the final outcome met specifications.
>
> The work responsibility of the management team included topsoil stripping and spreading, and spoil regrading and contouring. . . .
>
> . . . .
>
> As in any reclamation project, the chief objective was to restore the land and to satisfy the new government regulations. The increased sensitivity of the public and regulatory personnel regarding adverse and environmental impacts of mining activities requires companies to work a little harder to achieve an acceptable product. Although initially a demonstration project, the topsoil and regrading work fit well into the expertise of this contractor. Though the management team did not produce any startling new innovations, it did organize, control and manage a very successful operation, that was able to reduce costs and satisfy the mining laws.

The Department additionally called to the trial court's attention Granite's response to a Department interrogatory that asked it to detail the specific activities it performed for Peabody. Granite responded:

> Initially, Granite will perform the service of removal of topsoil overburden, which is located above the coal. The soil is either placed in a stockpile or placed

---

1. The Department did not seek to tax Granite's gross receipts attributed to excavation work at the Kayenta and Black Mesa mines. Only Gran-

ite's gross receipts from its participation in reclamation work are at issue in this litigation.

directly on a regraded spoil area if it is available. After the spoil has been rehandled and graded, Granite will replace topsoil on the reclaimed area. The spoil grading is principally accomplished with Peabody Coal Company dozers. Granite at times supplements Peabody equipment in this activity. In addition to these activities, Granite aids Peabody Coal Company's mining operations with the following services:

. . . .

Equipment and personnel management and maintenance—Granite repairs Peabody equipment and directs Peabody foremen, mechanics, and equipment operators.

In response to the Department's motion for summary judgment, Granite called other affidavits and deposition testimony to the trial court's attention. Department auditor Harold H. Sweet testified on deposition:

Q: Do you know who it was that controlled the activities of Granite on the mine site as far as its reclamation activities?

A: Peabody Coal.

Q: How do you know that?

A: They're the ones that basically scheduled what areas they worked in and what they did up there.

According to witnesses for Granite, Peabody prepared monthly mining plans and weekly reclamation plans to implement the mining plans filed with the Federal Mining Supervisor. Granite made available approximately twenty pieces of machinery necessary for reclamation work under the mining plan. The machines Granite provided were repaired by members of the United Mine Workers of America employed by Peabody. Granite supplied no operators for these machines. Peabody supplied its own equipment operators, all of whom were members of the United Mine Workers of America employed by Peabody. All these operators remained in Peabody's employ when Granite's contract with Peabody terminated in July of 1988.

Granite's witnesses further testified that Granite's office, field and mechanical supervisors were responsible for dispatching the machinery and scheduling its maintenance and repair, and supervising the maintenance of Peabody equipment used by Peabody's reclamation department. Peabody operators and equipment were used to do the same kind of work that was performed with Granite's equipment, including stripping and storing topsoil, preparing roads, pioneering work, rehandling overburden and topsoil respreading. Wayne Hilgedick, Peabody's Western Operation Reclamation Manager, testified on deposition that on an average day, Granite's project superintendent would find out from Peabody's reclamation department what work was to be done that day. He would determine from the supervisor of Granite's mechanics what equipment was available to operate, and would then "assign operators to equipment to perform the work."

Concerning the reclamation process, Hilgedick's affidavit stated:

(15) Peabody supervisors, including myself, continuously monitored the reclamation activity, making certain that Granite's equipment was in the scheduled area and that the reclamation was being conducted in the manner prescribed by federal law.

(16) If a Peabody supervisor found Granite's equipment being operated in the wrong area or if the reclamation was not being performed in compliance with federal law, he would immediately contact the Granite supervisor with respect to that piece of machinery by radio, giving the Granite supervisor the opportunity to implement the corrective action required by Peabody. If that supervisor was 30 or more minutes away from the site of the problem or if the situation jeopardized the safety of the operator or piece of equipment, the Peabody supervisor would take direct corrective action.

The Department audited Granite for two successive periods beginning January 1, 1980, and ending May 31, 1985. As a result of these audits, the Department assessed approximately $860,000.00 in additional transaction privilege taxes against

Granite. After exhausting its administrative remedies and paying the assessment under protest, Granite commenced the instant refund action in the superior court pursuant to A.R.S. § 42–124(B)(2).

The Department moved for summary judgment. After briefing was completed, the trial court granted summary judgment for the Department. The trial court held: (1) Granite's activities were taxable as prime contracting pursuant to A.R.S. § 42–1310(2)(i); (2) Granite was not a "subcontractor" exempt from the transaction privilege tax on prime contracting; and (3) imposition of the transaction privilege tax on Granite's activities in the Navajo/Hopi Joint Use Area was not an infringement on Indian sovereignty, and the federal Government had not preempted the State's authority to impose such a tax.

Granite has appealed from the formal judgment entered in accordance with the trial court's ruling and from the trial court's order denying its motion for a new trial.

### PREEMPTION EFFECT OF 25 U.S.C. § 640d–6

■ We first address Granite's contention that Arizona's transaction privilege taxation of Granite's gross receipts from Peabody for services within the Navajo/Hopi Joint Use Area has been preempted by the Navajo and Hopi Land Settlement Act of 1974, 25 U.S.C. § 640d *et seq.* Granite relies in particular on 25 U.S.C. § 640d–6, which provides:

> Joint ownership and management of coal, oil, gas and other minerals within or underlying partitioned lands; division of proceeds.
>
> Partition of the surface of the lands of the joint use area shall not affect the joint ownership status of the coal, oil, gas, and all other minerals within or underlying such lands. All such coal, oil, gas, and other minerals within or underlying such lands shall be managed jointly by the two tribes, subject to supervision and approval by the Secretary [of the Interior] as otherwise required by law, and the proceeds therefrom shall be divided between the tribes, share and share alike.

Granite's entire analysis in support of its argument is as follows:

> Congress, by enacting this legislation, has left no room for the state to interject its taxes. Permitting the state to do so is directly contrary to the management, Secretarial approval, and share-and-share-alike provisions of 25 U.S.C. § 640(d)–6. The comprehensive system designed to provide a resolution of the long standing dispute between the Navajo and Hopi tribes, cannot tolerate the intrusion of state taxes to complicate, confuse and/or detract from that effort.
>
> . . . .
>
> Within the Joint Use Area, then, Congress left no room for the state to legislate. It has preempted the state's right to exact taxes. Management and realization of benefits accrue to the Navajo and Hopi tribes subject to federal approval. The state, therefore, has no right to collect the transaction privilege tax in question on those activities which [take] place in the Joint Use Area. . . .

We do not agree. In *Peabody Coal Co. v. State,* 158 Ariz. 190, 761 P.2d 1094 (App. 1988), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1967, 104 L.Ed.2d 435 (1989), this court held that the comprehensive federal and Indian regulation of Peabody Coal's mining activities on the Navajo reservation and in the Joint Use Area did not preempt state transaction privilege taxation measured by Peabody's coal mining income. In so holding, we applied a two pronged analysis under which we concluded: (1) because of the state's expenditure of its revenues on the reservations, a sufficient state interest supported imposition of the tax despite heavy federal regulation of the taxed activity; and (2) because the Indian tribes' lease revenues were based on Peabody's gross realization figure, which included full reimbursement of Peabody's transaction privilege tax expenses by its coal customers, imposition of the taxes furthered both federal and tribal interests by increasing the royalties paid to both tribes.

Although we did not address any preemption argument based specifically on 25 U.S.C. § 640d–6 in *Peabody Coal Co.*, our analysis in that case is fully applicable here. Granite offers nothing that would tend to refute our prior conclusions in *Peabody Coal Co.* In that case, the state sought to collect far larger amounts from Peabody than it does from Granite in this case. Further, nothing in the record to which Granite has called our attention indicates that imposing state transaction privilege taxes on Granite would lessen the amount of the Navajo or Hopi tribe's revenues under their leases with Peabody. Finally, nothing in the language of 25 U.S.C. § 640d–6, the only specific authority on which Granite relies, provides any indication of a congressional intent to preclude state taxation of gross receipts from contracting services performed for non-Indian coal lessees in the Joint Use Area.

DID THE SERVICES GRANITE RENDERED TO PEABODY IN CONNECTION WITH PEABODY'S RECLAMATION ACTIVITIES CONSTITUTE "PRIME CONTRACTING"?

■ Granite presents two separate arguments on this issue. First, Granite contends that it "simply leased equipment to Peabody" and therefore was not engaged in "contracting" within the meaning of Arizona's transaction privilege tax statutes. If Granite's activities are viewed as the leasing of equipment rather than as contracting, the applicable tax statute would have been A.R.S. § 42–1314(A)(2), which provided for the assessment of transaction privilege taxes on the gross income derived from leasing tangible personal property. However, Granite points out that when leased equipment is "used directly" in mining, the rental income is exempt from Arizona's transaction privilege taxes pursuant to A.R.S. §§ 42–1312.01 and 42–1312.-

01(A)(2). Thus, Granite's argument is that because the questioned gross income was derived from exempt leasing transactions and not from contracting, it was entitled to the refund sought in its complaint.[2]

Granite's second argument on the contracting issue is that even if its activities under its contract with Peabody could be characterized as "contracting", Granite was a subcontractor and therefore was not subject to the tax on "prime contracting" as assessed by the Department in this case.

We now consider Granite's initial argument that its activities constituted leasing and did not fall within the statutory definition of "contracting". Former A.R.S. § 42–1310(2)(i) imposed a transaction privilege tax on the business of "prime contracting." A.R.S. § 42–1301(3) defined "contracting" as "engaging in business as a contractor." A.R.S. § 42–1301(4) provided:

"Contractor" is synonymous with the term "builder" and means a person, firm, partnership, corporation, association or other organization, or a combination of any of them, who undertakes to or offers to undertake to, or purports to have the capacity to undertake to, or submits a bid to, or does himself or by or through others, construct, alter, repair, add to, subtract from, improve, move, wreck or demolish any building, highway, road, railroad, excavation or other structure, project, development or improvement, or to do any part thereof, including the erection of scaffolding or other structure or works in connection therewith, and includes subcontractors and specialty contractors. For all purposes of taxation or deduction, this definition shall govern without regard to whether or not the contractor is acting in fulfillment of a contract.

Granite first argues that because the result of the reclamation activities is to re-

**2.** From the briefs on appeal, it appears that Granite prevailed at the administrative level on some issues relating to rental income, and that the amount to be refunded to Granite concerning those rental issues has not yet been determined by the Department, and is not in issue in this litigation. Although the record before us is unclear, we have assumed that the issues presented in this appeal concerning leasing or rental income involve gross income separate and apart from the amounts characterized as rental income in the administrative decision relating to Granite's contest of the assessment.

turn the affected areas as closely as possible to their original condition, the activities do not constitute contracting. We do not agree. Although reclamation of strip-mined land is mandated by federal law, reclamation activities that otherwise meet the statutory definition of "contracting" do not thereby become exempt from transaction privilege taxation. In this case the reclamation activities included recontouring, surface grading, respreading of stored topsoil, and seeding, revegetating and fencing reclaimed land. These activities constituted "altering," "repairing" and "adding to" an "excavation or other ... project" within ordinary English usage, and therefore constituted "contracting" under former A.R.S. § 42–1301(3) and (4).

Granite next contends that, even if it is assumed that the totality of the reclamation activities performed at the Peabody mines would meet the statutory definition of contracting, its services to Peabody in connection with the reclamation activities merely consisted of the rental of equipment without operators, and therefore was not "contracting". *See, City of Phoenix v. Bentley–Dille Gradall Rentals, Inc.*, 136 Ariz. 289, 665 P.2d 1011 (App.1983). We disagree. It is undisputed that Granite furnished its equipment without operators and that Peabody employees directly operated all the equipment Granite provided. However, *Bentley* does not hold that a business which provides equipment without operators *ipso facto* cannot be engaged in contracting no matter what its other responsibilities on the job might involve. Rather, that case establishes that there cannot be a true leasing of equipment if the owner has not substantially relinquished possession and control of the equipment. If the owner furnishes an operator with the equipment, then under *Bentley* the owner has maintained sufficient control over the equipment to negate the finding of a lease, at least for tax purposes. However, continued control by the owner may be established through other evidence.

Here, Granite did much more than merely furnish equipment without operators.

Under Granite's letter agreement with Peabody, Granite's superintendent and staff were to "work with [Peabody's] supervisors, engineers and foremen in ... directing Owner's labor and equipment." Granite's project superintendent Robert Cummings stated that the superintendent acted essentially as a "construction manager" who was responsible for "keeping the wheel rolling." He stated further that the management group Granite organized was responsible for "topsoil stripping and spreading, and spoil regrading and contouring." This management team saw to it that schedules were met, responsible individuals made their decisions on time, costs were held in control and the final outcome met specifications. Cummings stated:

> [T]he topsoil and regrading work fit well into the expertise of [Granite]. Though the management team did not produce any startling new innovations, it did organize, control and manage a very successful operation, that was able to reduce costs and satisfy the mining laws.

In answer to an interrogatory propounded by the Department, Granite specifically admitted that "[a]fter the spoil has been rehandled and graded, Granite will replace topsoil on the reclaimed area.... Granite repairs Peabody equipment and directs Peabody foremen, mechanics, and equipment operators." Wayne Hilgedick, Peabody's Western Operation Reclamation Manager, provided an example of Granite's intermediate supervisory role in the reclamation process. In his affidavit he stated that a Peabody supervisor who found Granite equipment being operated in the wrong area or not in compliance with federal reclamation law would give the Granite equipment supervisor the first opportunity to take corrective action, unless the Granite supervisor was unavailable or the situation was unsafe. Hilgedick also testified that while Peabody's reclamation department decided what work was to be done on any given day, it was Granite's project superintendent that assigned operators to equipment to perform the work based on the

day's work demands.[3] From this evidence it is clear that Granite maintained substantial control, if not outright possession of its equipment, thereby negating a finding that it leased its equipment to Peabody. As the trial court stated:

> Granite provided supervisory personnel who worked hand in hand with Peabody in planning and supervising the reclamation program. These supervisory services [take] the contract out of the scope of a contract for the rental of equipment without operators.

Granite nevertheless contends that contrary evidence provided by Granite presents issues of material fact that preclude the entry of summary judgment. Granite notes that the Department relied on an affidavit of a Department of Revenue mine appraiser to establish that "Granite" recontoured the strip-mined land and respread topsoil over it. Granite criticizes this affidavit as "simply a series of conclusions...." Granite also points out that the affidavit of Wayne Hilgedick stated that it was "Peabody" that regraded the surface and respread it with topsoil.

We cannot agree that the evidence before the trial court reflected any genuine issue of material fact on the question whether Granite participated in performing and superintending the reclamation activities. The statements Granite cites on appeal as raising material issues of fact merely affirm that Peabody as the owner of the leasehold maintained the ultimate control and supervision necessary to make certain that the reclamation results complied with Peabody's federally imposed reclamation responsibilities. The statements are not in conflict with the evidence relied on by the Department to demonstrate that Granite's responsibilities under, and the performance of, its contract with Peabody showed that Granite maintained sufficient control over its equipment so as to negate the existence of a lease. Likewise that same evidence demonstrated conclusively that Granite was engaged in contracting. It is immaterial that Peabody also participated in the reclamation activities.

In conclusion on this issue, the evidence Granite emphasized in the trial court established that Peabody retained overall planning and supervisory control of the project and that Granite's supervisors "dispatched" Granite machinery and scheduled and supervised its maintenance. The evidence presented to the trial court establishes without conflict that Granite's supervisors also had an intermediate supervisory role over the reclamation work itself. Nothing that Granite brought to the trial court's attention genuinely controverted that view. Accordingly, Granite's activities could not be considered as the mere leasing of equipment, but rather, constituted "contracting" under Arizona's transaction privilege tax statutes. Therefore, we need not determine whether Granite's equipment was "used directly" in mining so as to qualify for the rental tax exemption set forth in A.R.S. § 42–1312.01(A)(2).

■ We next consider whether Granite was engaged in "prime contracting" so as to be subject to the tax assessed by the Department. During the audit periods in question in this case, not every person engaged in the business of "contracting" was subject to transaction privilege taxation on his gross income. Like current A.R.S. § 42–1310.16, former A.R.S. § 42–1310(2)(i) imposed a transaction privilege tax only on the business of "prime contracting." Former A.R.S. § 42–1301 provided in part:

> (16) "Prime contracting" means engaging in business as a prime contractor.

> (17) "Prime contractor" means the contractor who supervises, performs or coordinates the construction, alteration, repair, addition, subtraction, improvement, movement, wreckage or demolition of any building, highway, road, railroad, excavation or other structure, project, development or improvement including the contracting, if any, with any subcontractors or specialty contractors and is re-

---

**3.** We also note that before the Board of Tax Appeals, Granite admitted that it had enjoyed "a significant amount of autonomy" on the job.

See, *Granite Construction Company v. Department of Revenue,* [2 Ariz.] (CCH) St. Tax Rep. § 200–741 (April 7, 1987).

sponsible for the completion of the contract.

Former A.R.S. § 42-1310(2)(i) provided in part:

Subcontractors or others who perform services in respect to any improvement, building, highway, road, railroad, excavation or other structure, project, development or improvement shall not be subject to such tax if they can demonstrate that the job was within the control of a prime contractor or prime contractors and that such prime contractor is liable for such tax upon the gross income, gross proceeds of sale or gross receipts attributable to the job and from which the subcontractors or others were paid.

Granite contends that, assuming its reclamation activities constituted contracting, it performed them as a subcontractor and not as a prime contractor, and therefore was not subject to the prime contracting tax. *See,* A.R.S. § 42-1310(2)(i).

In order to prevail on this contention, Granite must demonstrate that "the job was within the control of a prime contractor or prime contractors." Granite contends that it has met this requirement by showing that Peabody was the prime contractor concerning the activities in question. We find nothing in the record to support this contention.

As defined above in A.R.S. § 42-1301(17), a "prime contractor" is the contractor "responsible for the completion of the contract." It is clear from the context of the statute that "the contract" referred to is a contract entered into between the prime contractor and another that requires the prime contractor to "supervise[s], perform[s] or coordinate[s]" the contracting activities referred to in the statute for that other party.[4] Under the

leases involved in this case, Peabody is a lessee leasing lands from the Navajo and Hopi tribes. Granite has not called our attention to, nor have we found, any provision in those leases that requires Peabody to perform for the lessors the activities defined in the statutes as constituting "prime contracting." The leases do require that Peabody pay a royalty to the tribes measured by the value of the coal mined by Peabody, but Peabody mines and sells the coal on its own account. It is not required to, and does not mine its coal for the tribes. Since Peabody does not perform any of the statutorily designated services for the tribe, it cannot be considered a "prime contractor" so as to enable Granite to come within the statutory definition of a subcontractor entitled to a subcontractor's exemption.[5]

We also note that Granite has failed to meet an additional statutory prerequisite to the claiming of a subcontractor's exemption. Granite has failed to show that Peabody was liable for transaction privilege taxes on the gross income "attributable to the job and from which the subcontractors or others were paid." In this case the "job" consisted of reclamation activities to restore strip-mined land as closely as possible to its original condition. This "job" was certainly within Peabody's control. However, even if we assume that Peabody acted as a "prime contractor," it is clear that any transaction privilege taxes for which Peabody was liable were not paid on gross income "attributable to the job ..." within the meaning of A.R.S. § 42-1310(2)(i).

Viewed in conjunction with the definition of "prime contractor" in former A.R.S. § 42-1301(17), the term "job" in former § 42-1310(2)(i) was manifestly intended to

4. Although there has been considerable discussion in prior Arizona decisions concerning whether a person must have been acting "in fulfillment of a contract" in order to engage in the business of contracting under Arizona's tax statutes, *see, SDC Management, Inc. v. State of Arizona*, 1 CA–CV 88–597 (App. Nov. __, 1990), these decisions are no longer pertinent when the question involves "prime contracting." As noted, the statutory definition now expressly requires the existence of a contract.

5. In its opening brief, Granite also suggests that Peabody's contracts for the sale of coal to its utility customers might be pertinent on the issue of whether Peabody was a prime contractor. While we doubt the relevance of such contracts, suffice it to note that there is nothing in the record before this court concerning the provisions of these contracts.

refer to the overall work on the "contract" the prime contractor must "complete" to generate the gross income, gross proceeds of sale or gross receipts that are subject to transaction privilege taxation under A.R.S. § 42–1310(2). In this case Peabody was required to accomplish certain reclamation results under federal law in the performance of any coal mining it undertook pursuant to its leases with the Navajo and Hopi tribes. However, it did not have a "contract" under which it was paid to perform these reclamation activities. The income on which Peabody was subject to transaction privilege taxation came instead from its sales of coal to electric utilities. *See* former A.R.S. § 42–1310(2)(a) (taxing receipts from business of "mining ... for sale, profit or commercial use any ... mineral product ...") Accordingly, Peabody was not liable for transaction privilege taxes on gross income "attributable to the job" on which Granite claimed to be a subcontractor. Thus Granite fails to meet a second statutory prerequisite to eligibility for the subcontractor exemption.

For the reasons set forth in this opinion, we conclude that the trial court correctly granted the Department's motion for summary judgment. The judgment is affirmed.

GERBER, P.J., and BROOKS, J., concur.

Note: Retired Judge LEVI RAY HAIRE was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.