No. 91-635

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

THE STATE OF MONTANA, EX REL.,
STANFORD R. POLL, ARTHUR A. LINDLIEF
AND DONALD C. JUNEAU,

        Relators,

   -vs-

MONTANA NINTH JUDICIAL DISTRICT COURT,
GLACIER COUNTY, THE HONORABLE ROBERT S.
KELLER, Presiding Judge,

        Respondent.

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

      For Relators:

           Joseph R. Hunt argued, Johnson & Hunt, (Juneau)
           Shelby, Montana
           Charles F. Moses, Moses Law Firm, (Lindlief)
           Billings, Montana
           Marcus S. Topel, David R. Callaway argued, Topel &
           Goodman, (Poll) San Francisco, California

      For Respondent:

           Hon. Marc Racicot, Attorney General,
           Deanne L. Sandholm argued, Assistant Attorney
           General, Helena, Montana
           James C. Nelson, Glacier County Attorney, Cut Bank,
           Montana

Submitted: September 24, 1992

Decided: April 13, 1993

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This case arose from a criminal proceeding in Glacier County. The information charged 58 counts of misdemeanor conspiracy in violation of § 45-4-102(1), MCA, involving agreements to conduct illegal gambling activities at the Montana Restaurant and Casino on the Blackfeet Indian Reservation in Browning, Montana. Defendants moved to dismiss for lack of jurisdiction. The District Court for the Ninth Judicial District, Glacier County, denied the motion. This Court accepted supervisory control in order to determine the jurisdictional issue before trial. We affirm.

The issues before us are:

1. For purposes of criminal jurisdiction, is a person an "Indian" if he has no Indian ancestry but has been adopted by an Indian family and raised on the reservation?

2. Does the State of Montana have jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim?

3. Does the State of Montana have authority to regulate gambling on the reservation?

Carl Kipp, Bob Juneau and defendant, Don Juneau operated the Montana Restaurant and Casino on the Blackfeet Reservation in Glacier County, Montana. The Blackfeet tribal business permit was in Carl Kipp's name. It was stipulated that Carl Kipp and Bob Juneau are Indians. Don Juneau's Indian status is at issue.

On November 9, 1988, the Glacier County Attorney, filed an information charging Stanford R. Poll (Poll), Arthur A. Lindlief (Lindlief) and Don Juneau with 58 counts of misdemeanor conspiracy

2

in violation of § 45-4-102(1), MCA, involving agreements to conduct illegal gambling activities at the Montana Restaurant and Casino (Casino) in Browning, Montana. All offenses are alleged to have occurred between May 1, 1987, and June 1, 1988. The information charged the defendants with conspiring with Carl Kipp.

On February 23, 1989, defendants Lindlief and Poll filed a motion to dismiss the information for lack of jurisdiction because of (a) the exclusive territorial jurisdiction of the Blackfeet Tribe; (b) the sovereignty of the Blackfeet Tribe; (c) the preemption by the federal government under Article VI of the United States Constitution and controlling jurisdiction over all Indian affairs; and (d) the preemption by the Blackfeet Nation of jurisdiction over business activities within the exterior boundaries of the Blackfeet Reservation.

The State opposed the motion arguing that all three defendants -- Poll, Lindlief and Don Juneau, were non-Indian; that the Casino was owned and operated by the defendants and not the Tribe; and the Tribe had not adopted any comprehensive scheme of legislation authorizing, controlling or regulating gambling on the Blackfeet Indian Reservation, whether by Indians or non-Indians.

Lindlief and Poll challenged the State's assertion concerning Don Juneau's non-Indian status and further contended that their criminal liability was predicated solely on the conduct of individuals who were Indians not subject to state jurisdiction and that the Casino was being operated pursuant to a tribal business license and gambling permit.

The District Court denied the motion to dismiss, however, urging this Court to accept an application for an appropriate writ

3

in order to determine the jurisdictional question in advance of trial. Subsequently, Lindlief filed a petition for a writ of supervisory control with this Court. This Court denied the petition on the grounds there was not an adequate factual record upon which it could exercise supervisory control.

The District Court held an evidentiary hearing on May 19, 1990. Subsequent to the hearing, the parties again submitted briefs arguing the jurisdiction of the state court. The District Court again denied the defendants' motion to dismiss.

On December 31, 1991, Poll, Lindlief and Don Juneau again petitioned this Court to issue a writ of supervisory control. On March 10, 1992, this Court accepted jurisdiction of the application for writ of supervisory control to determine the jurisdictional issue before trial. Additional briefing was ordered and the case was orally argued before this Court on September 2, 1992.

I

For purposes of criminal jurisdiction, is a person an "Indian" if he has no Indian ancestry but has been adopted by an Indian family and raised on the reservation?

It was stipulated by the parties that Lindlief and Poll are not Indians. Therefore, this issue centers on defendant Don Juneau. Don Juneau was born of non-Indian parents but later adopted by an Indian, Benton Juneau. Don Juneau was raised on the Blackfeet Reservation and has lived and worked there all his life. Don Juneau testified that he is not enrolled as a member of any federally recognized Indian tribe; he does not vote in Indian elections; he does not receive any per capita federal benefits as an Indian; and, he has never held a Tribal office. He is married

4

to a full-blooded member of the Rocky Boy Tribe and has children that are half Indian.

Defendants maintain that Don Juneau is an "Indian" for purposes of criminal jurisdiction. They maintain that Congress has not defined "Indian" as it is used in criminal jurisdiction statutes. They contend that since Don Juneau was adopted by Indian parents, under Montana adoption laws, he is also Indian. Section 40-8-125(1), MCA, provides:

> After the final decree of adoption is entered, the relation of parent and child and all the rights, duties, and other legal consequences of the natural relation of child and parent shall thereafter exist between such adopted child and the adoptive parents adopting such child and the kindred of the adoptive parents.

Under this statute, the adopted child joins the adoptive family as if born to them. Don Juneau's father is 5/8 Indian. Thus, Don Juneau maintains that under the above statute, he is 5/16 Indian and therefore, is an "Indian" under federal and state law.

Defendants maintain that for purposes of criminal jurisdiction, "Indian" is a status, not a racial classification. United States v. Indian Boy X (9th Cir. 1977), 565 F.2d 585 (The Ninth Circuit based federal jurisdiction on residence and enrollment without mention of the percentage of Indian blood); St. Cloud v. United States (D.S.D. 1988), 702 F.Supp. 1456 (The court noted that Indian blood alone was not sufficient to warrant criminal jurisdiction because jurisdiction over Indians on reservations was based on status, not race).

Defendants contend that although Don Juneau is not a tribal member and he has no Indian blood, everything else about his life is Indian; he was adopted by an Indian; attended Indian schools;

5

practiced the Indian religion; participated in tribal customs; married an Indian; has Indian friends; and, has Indian children. Thus, defendants urge that Don Juneau is an Indian and meets the status of Indian for criminal jurisdiction purposes.

The State maintains that criminal jurisdiction of the state court over Don Juneau, is dependent upon a determination of Don Juneau's status as a non-Indian, citing State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983, where this Court adopted the two-prong test of United States v. Rogers (1845), 4 How. 567, 16 U.S. 200, for determining whether a person has Indian status: (1) the defendant must have a significant amount of Indian blood; and (2) the defendant must have federal or tribal recognition as an Indian. Don Juneau is unable to meet either prong of the test. The State urges that Don Juneau fails the first part of the test because he has no Indian blood. He fails the second part of the test because he is not an enrolled member of the tribe and he receives no federal benefits as an Indian.

The LaPier case is controlling. Under the second prong of the LaPier test, Don Juneau was required to show that he had federal or tribal recognition as an Indian. He has failed to submit any proof to demonstrate the Blackfeet Tribe has recognized him as an Indian. As previously pointed out, he is not an enrolled member of any Indian tribe and he receives no federal benefits as an Indian. We therefore conclude that Don Juneau has failed to prove that he has received federal or tribal recognition as an Indian. We conclude that Don Juneau has failed to meet the test of LaPier.

We do not find it necessary to discuss the issue from LaPier of the necessity of a significant amount of Indian blood. As

6

mentioned, the defendants contend that such a definition is no longer appropriate because "Indian" is a status, and not a racial classification to be determined by quantity of Indian blood. Because Don Juneau has failed the second part of the LaPier test, no further discussion is necessary.

We hold that Don Juneau is not an Indian for purposes of criminal jurisdiction.

II

Does the State of Montana have jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim?

Defendants maintain that when making a determination as to whether a state has jurisdiction over particular victimless crimes committed by non-Indians within the reservation, it is necessary to examine the federal, tribal and state interests involved to determine if the particular state has been preempted.

The respondents contend that the assertion of state authority within the reservation boundaries does not infringe upon federal interests when a non-Indian commits an offense against a non-Indian. Duro v. Reina (1990), 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693; State v. LaPier (1990), 242 Mont. 335, 790 P.2d 983; State v. Snyder (Idaho 1991), 807 P.2d 55. The State notes that the defendants in this case are charged with conspiracy, and that the object of each conspiracy charged in this case is a violation of a particular gambling law of the State. The State contends that violation of the gambling laws of Montana are also victimless crimes because they are committed without injury to persons or the

7

property of persons, and that therefore, the State has jurisdiction in this case where victimless crimes have been committed by non-Indians.

As respondent contends, it is a well-established rule of law that Indian tribes do not have criminal jurisdiction over non-Indians. In Duro, the Supreme Court stated:

> Oliphant established that the inherent sovereignty of the Indian tribes does not extend to criminal jurisdiction over non-Indians who commit crimes on the reservation. Wheeler reaffirmed the longstanding recognition of tribal jurisdiction over crimes committed by tribe members.

Duro, 110 S.Ct. at 2059. The Duro Court extended that rule by holding that tribal jurisdiction does not extend to non-member Indians. Id. at 2059.

Not only is Don Juneau not a member of the Blackfeet Tribe, he is not an Indian. Therefore, under Duro the Blackfeet Tribe has no criminal jurisdiction over him. We hold that the State of Montana has jurisdiction over non-Indian defendants for crimes committed on the reservation where there is no Indian victim.

III

Does the State of Montana have authority to regulate gambling on the reservation?

Defendants maintain that it is not the involvement of the defendants with the tribe that is at issue here, but rather the tribe's involvement in licensing and regulating gambling on the Blackfeet Reservation. They urge that State jurisdiction would interfere with tribal sovereignty. They point out that the failure of the State to regulate gambling on the reservation will not impede the State's ability to regulate gambling outside of the

8

reservation. They further contend that the Blackfeet Tribe passed a gambling ordinance to license gambling and gambling establishments within the reservation; and that application of State law to gambling activities within the reservation would significantly impact tribal finances, employment opportunities and its right to self-govern.

The State maintains that the determination of jurisdiction over the gambling activities of the defendants requires a particularized inquiry into the federal and tribal interests at stake as reflected in federal law and the State interests at stake. The State maintains that it has a substantial interest in protecting its citizens from the problems associated with unregulated gambling and that Montana has strictly regulated gambling. Section 23-5-102, MCA (1987). Finally, the State contends that the exercise of state authority within the Blackfeet Reservation does not infringe upon federal or tribal interests where a non-Indian commits an offense against a non-Indian.

In White Mountain Apache Tribe v. Bracker (1980), 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665, the State of Arizona sought to apply its motor carrier license and use taxes to the Pinetop Logging Company (Pinetop). Pinetop consisted of two non-Indian corporations doing business solely on the Reservation. Pinetop paid the taxes under protest, and then brought suit asserting that under federal law the taxes could not lawfully be imposed on logging activities conducted exclusively within the reservation or on hauling activities on Bureau of Indian Affairs (BIA) and tribal roads.

9

The United States was a party to the action and argued that the federal government's regulation of the harvesting, sale and management of tribal timber through the BIA covered every aspect of logging, from the making of the initial contracts between the BIA with other parties to the ultimate disposition of the timber. The White Mountain Tribe was also a party to the action. It argued that the tax would have an adverse affect upon the Tribe's profit and that the imposition of taxes would undermine the federal policy of assuring profits which would inure to the Tribe.

The Court concluded that federal management was so pervasive as to preclude the additional burdens resulting from the Arizona taxes and held that the Arizona taxes were preempted by federal law. It held that where a State asserts authority over the conduct of non-Indians engaging in activity on the reservation, a particularized inquiry must be made into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law. White Mountain, 448 U.S. at 145.

In the case before us, in contrast to White Mountain, neither the United States nor the tribe are parties to the action. The United States could have made itself a party and argued that federal law preempted State law, but it did not. Similarly, the Tribe could have entered the proceedings and argued that the State's involvement would adversely affect the Tribe's gambling ordinance, but it did not. Only the non-Indian defendants argue

10

that the State's involvement would adversely affect the Tribe's gambling ordinance.

The dissent contends that the application of the Federal Indian Gaming Regulatory Act is a sufficient basis for denying State jurisdiction over the prosecution of the defendants. The offenses charged in the information occurred between May 1, 1987 and June 1, 1988. The effective date of the Indian Gaming Regulatory Act was October 17, 1988. Clearly the application of such an extensive regulatory act to alleged criminal activities which occurred prior to its enactment would be improper. It would violate both state and federal law with regard to ex post facto laws. As previously noted, the United States could have made itself a party and argued for federal law preemption but chose not to do so. We do not find it necessary to further discuss the Indian Gaming Regulatory Act.

With regard to the claimed adverse effect upon the Tribe's gambling ordinance the recent case of Northern Border Pipeline Co. v. State of Montana (1989), 237 Mont. 117, 772 P.2d 829, is applicable. In that case this Court considered the argument on the part of Northern Border Pipeline Company, that the tax interfered with tribal self-government. This Court stated:

> Northern Border argues that it has standing to bring the claims advanced in this suit by virtue of its taxpayer status and the direct economic injury it suffers from the double taxation. <u>Northern Border further argues that this Court has previously addressed self-government issues in cases where no Indian tribes were parties. . . . Our reading of these cases shows Northern Border's argument to be incorrect</u>. Our decision in <u>Burlington Northern</u> was based on applicable federal regulations, and did not address self-government. The plaintiff in <u>Eagleman</u>, while technically not an "Indian tribe," was an individual who was "an enrolled member of the Fort Peck

11

Sioux and Assiniboine Tribes." . . . Northern Border also cites two recent state court decisions, one from Arizona and one from New Mexico, for the proposition that consideration of a federal preemption claim necessarily includes consideration of self-government, thereby affording standing for a non-Indian to assert a self-government claim. We disagree with these holdings, and decline to apply them. (Citations omitted.) (Emphasis added.)

Northern Border Pipeline Co., 237 Mont. at 128, 772 P.2d at 836.

Based upon White Mountain Apache and Northern Border, we conclude that the defendants do not have standing to raise the argument that the action of the State interferes with the self-government of the Blackfeet Reservation. We hold that the State of Montana has authority to regulate gambling by non-Indians on the reservation.

We hold that the District Court properly had jurisdiction.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
District Judge Thomas Honzel
for Justice William E. Hunt, Sr.

12

Justice Terry N. Trieweiler concurring in part and dissenting in part.

I concur with the majority's conclusion that Donald Juneau has not offered sufficient evidence to establish that he is an Indian as that status pertains to jurisdictional considerations. However, I disagree with this Court's holding in *State v. LaPier* (1990), 242 Mont. 335, 790 P.2d 983, that to prove status as an Indian requires a person to prove both a significant amount of Indian blood and tribal or federal recognition. That test is antiquated and ignores the modern reality that many people of Indian descent are not enrolled tribal members for various reasons and that an inherent element of tribal sovereignty is to enroll members, regardless of their degree of Indian ancestry. However, in this case, Juneau has not proven Indian status by any criteria which has been previously recognized in case law or by federal statute.

I concur with the majority's conclusion that Indian tribes do not have criminal jurisdiction over non-Indians. However, that lack of jurisdiction is not based upon the U.S. Supreme Court's decision in *Duro v. Reina* (1990), 495 U.S. 676, 110 S. Ct. 2053, 109 L. Ed. 2d 693. *Duro* was concerned with tribal authority to prosecute a nonmember Indian who committed a crime on tribal land. Furthermore, regardless of *Duro*'s applicability to this case, it has been effectively reversed by a subsequent Congressional action which restored tribal criminal jurisdiction over nonmember Indians

13

who break the law on tribal land. As pointed out in *Mousseaux v. United States Commissioner of Indian Affairs* (D.S.D. 1992), 806 F. Supp. 1433:

> [On] October 24, emergency legislation was passed amending the Indian Civil Rights Act, 25 U.S.C. § 1301(2) and (3), and legislatively overruling the Supreme Court's holding in *Duro*. This temporary legislation was later replaced with identical permanent legislation on October 28, 1991.

*Mousseaux*, 806 F. Supp. at 1440.

Indian tribes lack criminal jurisdiction over non-Indians who commit crimes on tribal land because of the U.S. Supreme Court's decision in *Oliphant v. Suquamish Indian Tribe* (1978), 435 U.S. 191, 98 S. Ct. 1011, 55 L. Ed. 2d 209. In his dissent to that decision, Justice Marshall stated:

> In the absence of affirmative withdrawal by treaty or statute, I am of the view that Indian tribes enjoy as a necessary aspect of their retained sovereignty the right to try and punish all persons who commit offenses against tribal law within the reservation.

*Oliphant*, 435 U.S. at 212.

While I agree with Justice Marshall's dissent, and while the majority opinion in *Oliphant* appears to be neither historically nor legally well-founded, it does preclude tribal criminal jurisdiction over non-Indians for laws broken on the reservation. However, it does not logically follow that because tribes cannot prosecute non-Indians who commit crimes in Indian country, that the State of Montana has jurisdiction over non-Indian defendants for crimes committed on the reservation. That conclusion in Issue II of the

14

majority opinion completely ignores the traditional role of the federal government in Indian affairs.

The proper test for determining whether the State of Montana has regulatory authority over <u>any</u> activity committed on the Blackfeet Reservation, through its criminal statutes or otherwise, is the test set forth by the U.S. Supreme Court in *White Mountain Apache Tribe v. Bracker* (1980), 448 U.S. 136, 100 S. Ct. 2578, 65 L. Ed. 2d 665. In that case, the U.S. Supreme Court held that where, as in this case, "a state asserts authority over the conduct of non-Indians engaging in activity on the reservation, there must be:

> [A] particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law.

*White Mountain*, 448 U.S. at 145.

The majority opinion has performed no such analysis. It relies on its previous decision in *Northern Border Pipeline Company v. State* (1989), 237 Mont. 117, 772 P.2d 829, for its refusal to do so. For reasons I will explain later in this opinion, I decline to follow this Court's decision in *Northern Border Pipeline*. However, the majority (which relies on *Northern Border Pipeline*) has refused to even perform that degree of analysis which is required by its previous decision. In *Northern Border Pipeline*, the dispute was over property taxes assessed by the State of Montana against that portion of a natural gas pipeline which traversed an Indian reservation, but which was owned

15

by a non-Indian corporation. The portion which ran through the reservation was also taxed by the Assiniboine and Sioux Tribes. On appeal, Northern Border Pipeline argued that the State was preempted by federal regulation and that its tax interfered with the Tribes' sovereign rights of self-government. After an extensive discussion of federal regulation in this area, the majority concluded that the tax was neither preempted by federal statutes nor regulations. However, it held that since neither the Tribes nor the federal government were parties to the suit, plaintiff did not have standing to assert the Tribes' sovereign right of self-government.

I disagree with that conclusion because under the *White Mountain* test, an analysis of the state, federal, and tribal interests involves related considerations which cannot be analyzed separately. After pointing out in the *White Mountain* decision that both federal law and the rights of reservation Indians to make their own laws may provide independent, but related barriers to the assertion of state regulatory authority, the U.S. Supreme Court stated:

> The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members. They are related, however, in two important ways. The right of tribal self-government is ultimately dependent on and subject to the broad power of Congress.

*White Mountain*, 448 U.S. at 143.

16

Therefore, I agree with the reasoning of the Court of Appeals of Arizona in *Peabody Coal Company v. Arizona* (1988), 761 P.2d 1094, where under the same circumstances it held as follows:

> The state asserts that Peabody lacks standing to argue interference with tribal sovereignty rights. We disagree. In *Ramah Navajo School Bd. v. Bureau of Revenue*, 458 U.S. 832, 102 S.Ct. 3394, 73 L.Ed.2d 1174 (1982), the United States Supreme Court stated that to determine whether a state tax may be applied to a business performed on Indian reservation land without violating federal law, federal, tribal, and state interests must be analyzed. "These interests tend to erect two 'independent but related' barriers to the exercise of state authority over commercial activity on an Indian reservation: state authority may be pre-empted by federal law, or it may interfere with the tribe's ability to exercise its sovereign functions." *Id.* at 837, 102 S.Ct. at 3398, 73 L.Ed.2d at 1179; *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). <u>Because the preemption issue cannot be considered without also considering the tribal sovereignty issue[,] Peabody, of necessity, must have standing to raise the issue of interference with tribal sovereignty.</u> [Emphasis added.]

*Peabody Coal Co.*, 761 P.2d at 1098-99, *cert. denied* (1989), 490 U.S. 1051, 109 S. Ct. 1967, 104 L. Ed. 2d 435.

Therefore, I will discuss in this opinion both federal preemption and the State's interference with the Tribe's ability to exercise its sovereign function. However, by failing to discuss <u>either</u> issue, the majority has not even followed its previous decision in *Northern Border Pipeline* which it relied on to ignore the issues raised by defendants on appeal.

## FEDERAL PREEMPTION

The involvement of the federal government in the issue of gambling on Indian reservations is extensive. In 1951, Congress

17

prohibited the possession of gambling devices in Indian country. 15 U.S.C. § 1175 (1951). In 1970, Congress enacted the Organized Crime Control Act, found at 18 U.S.C. § 1955 (1970), which prohibits and provides federal punishment for the operation of illegal gambling businesses. That Act has been previously held applicable to Indian reservations. *United States v. Farris*, (9th Cir. 1980), 624 F.2d 890, *cert. denied* (1981), 449 U.S. 1111, 101 S. Ct. 920, 66 L. Ed. 2d 839.

However, the most comprehensive federal preemption of all is contained in the Indian Gaming Regulatory Act which was enacted by Congress and became effective on October 17, 1988. Its provisions are included in 18 U.S.C. §§ 1166 to 1168 (1988), and 25 U.S.C. §§ 2701 to 2721 (1988). For purposes of considering the federal and Indian interests in this issue, it is especially enlightening to refer to the Congressional findings which precede the actual terms of the Act and are set forth at 25 U.S.C. § 2701 (1988). There, Congress stated that:

> (1) numerous Indian tribes have become engaged in or have licensed gaming activities on Indian lands as a means of generating tribal governmental revenue;

> (2) Federal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts;

> (3) existing Federal law does not provide clear standards or regulations for the conduct of gaming on Indian lands;

> (4) a principal goal of Federal Indian policy is to promote tribal economic development, tribal self-sufficiency, and strong tribal government; and

18

(5) Indian tribes have the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity. [Emphasis added.]

Based upon these policy considerations, Congress has established comprehensive and extensive control over gambling on Indian reservations, including legalization of some forms of gambling, 18 U.S.C. § 1166(c)(1) (1988); establishment of a commission to monitor gaming on Indian lands, 25 U.S.C. §§ 2704 and 2706 (1988); delegation of exclusive jurisdiction to the tribes over some forms of gambling, 25 U.S.C. § 2710 (1988); authorization for tribes to enter into negotiations with the various states for the purpose of reaching an agreement concerning the conduct of gaming activities on reservations, 25 U.S.C. § 2710(d)(3)(A) (1988); authority for tribes to enter into management contracts for the operation of gaming facilities, 25 U.S.C. § 2711 (1988); and provision for the imposition of a civil fine for the violation of any of the Act's provisions, 25 U.S.C. § 2713 (1988). Most importantly, however, may be the provision found at 18 U.S.C. § 1166(d) (1988) which provides that:

> The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

19

The majority suggests that it need not consider this federal statute, which gives the United States exclusive jurisdiction over criminal prosecutions for violations of State gambling laws, on the grounds that the violations that are alleged in this case occurred prior to the effective date of the Federal Act. The majority reasons that to apply the unequivocal federal preemptions found at 18 U.S.C. § 1166(d) (1988) would violate constitutional provisions which prohibit *ex post facto* laws. However, in making this argument, the majority completely ignores its previous definition of *ex post facto* laws. In *State v. Leistiko* (Mont. 1992), 844 P.2d 97, 49 St. Rep. 1104, we established a two-part test to determine whether a statute violates the ban on *ex post facto* laws. In order to satisfy the test, we held that: "(1) the law must be retrospective, and (2) it must disadvantage the offender affected by it. *Miller v. Florida* (1987), 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351, 360-61." *Leistiko*, 844 P.2d at 100. We also held that "[t]o meet the second prong of the test, the United States Supreme Court has said, '[i]t is axiomatic that for a law to be ex post facto it must be more onerous than the prior law.'" [Citation omitted.] *Leistiko*, 844 P.2d at 100.

As applied to the facts in this case, 18 U.S.C. § 1166(d) (1988) is not an *ex post facto* law because it would not disadvantage the defendants. It does not change the substantive law that pertained to their conduct. It merely specifies which government

20

has jurisdiction to prosecute them for violations of those State gaming laws that they are accused of having violated. It is merely a procedural change, and as we have previously pointed out in *State v. Coleman* (1979), 185 Mont. 299, 315, 605 P.2d 1000, 1011, "changes in procedure not affecting materially the rights of a defendant do *not* come within the constitutional prohibition" against *ex post facto* laws.

The provision found at 18 U.S.C. § 1166(d) (1988) is clearly procedural, and became effective on October 17, 1988. The prosecution of this action was not commenced until November 8, 1988, and if for no other reason, was prohibited by the terms of this statute. It is clear that without considering the separate tribal interests, the independent but interrelated federal interest is sufficient to preclude the exercise of state jurisdiction over the defendants in this case. The federal government has specifically recognized by statute that federal Indian policy is to promote tribal economic development and self-sufficiency and that the best way to do that is to give Indian tribes the exclusive authority to regulate gaming activity on their reservations, so long as it is not specifically prohibited by federal law and is conducted in a state where the activity is not otherwise prohibited. 25 U.S.C. § 2701 (1988). Furthermore, even when federal or state laws which regulate gambling are violated in Indian country, the federal government has exclusive jurisdiction over criminal prosecutions for those violations.

21

While consideration of federal interests and federal preemption is, by itself, a sufficient basis for denying state jurisdiction over the prosecution of these defendants, an examination of tribal interests in this matter, and a comparison of the State's interest, make the error of the majority opinion even clearer.

## TRIBAL INTERESTS

First of all, it is clear that the Blackfeet Tribe provided a comprehensive set of laws regulating gambling on its reservation, even before federal enactment of the Indian Gaming Regulatory Act. In 1975, the Blackfeet Tribe of the Blackfeet Reservation enacted an amendment to Ordinance No. 41 of the Blackfeet Tribal Law and Order Code of 1967. That amended ordinance permitted gambling on the Blackfeet Reservation only in accordance with the ordinance. It established a gaming commission for the purpose of adopting rules and regulations pertaining to gambling and for the purpose of issuing licenses to gaming establishments. The ordinance also provided for criminal penalties for its violation.

In addition to setting up this regulatory system for gaming on the Blackfeet Reservation, the Tribal Ordinance set forth specific regulations regarding sports or gambling pools; punch boards, pull tabs, and similar devices; bingo, raffles, and keno; horse race betting and pari-mutuel betting; setting the legal age for gambling; prohibiting gambling for anything other than cash; and establishing specific procedures for criminal and civil enforcement of the ordinance. There can be no question that state regulation

22

under these circumstances would have a strong impact "on the right of reservation Indians to make their own laws and be ruled by them."

Furthermore, the facts in this case demonstrate that almost all of the impact of the gaming operation which the defendants were involved in was upon Indians located on the Blackfeet Reservation. The Montana Restaurant and Casino, where the activity complained of took place, was owned by three people, Donald Juneau, Bob Juneau, and Carl Kipp. Both Bob Juneau and Carl Kipp were Indians. The evidence indicated that, on the average, 90 percent of the customers who gambled on the premises were Indian. Of the 21 employees at the business, 20 were Indian. And before the business could operate, both a tribal business permit and a license for each video poker and keno machine had to be issued by the Tribal Department of Revenue. In other words, the Tribe had an interest in protecting the business's customers, providing employment on the reservation, and in generating tribal revenue.

It is clear from all of the foregoing that tribal interests and the interests of the Tribe in self-government weigh heavily in favor of prohibiting State jurisdiction over the activities of the defendants.

## STATE INTEREST

The State interest, on the other hand, is very slight, if any exists at all. The State contends that it has a substantial interest in regulating gambling throughout the State of Montana in order to protect the welfare of its citizens and avoid the

23

domination of gaming enterprises by organized crime. It cites authority for the proposition that excessive casino gambling can produce serious harmful effects on the health, safety, and welfare of its citizens, including the "disruption of moral and cultural patterns, the increase in local crime, the fostering of prostitution, the development of corruption, and the infiltration of organized crime." *Posadas de Puerto Rico Assoc. v. Tourism Co.* (1986), 478 U.S. 328, 341, 106 S. Ct. 2968, 2977, 92 L. Ed. 2d 266, 280.

The State's expressed concern for the moral well-being of its citizens would be more persuasive if it was not engaged in the promotion of gambling activities through its own state lottery (*see* Montana State Lottery Act of 1985, Title 23, Chapter 5, Part 10, renumbered in 1991 as Title 23, Chapter 7, *see specifically*, § 23-7-102, MCA), and if local governments were not becoming increasingly dependent on revenue generated by off-reservation gambling enterprises. (*See* § 23-5-409, MCA, Bingo and Keno; § 23-5-306, MCA, Live Card Game Tables; §§ 23-5-610 and -612, MCA, Video Gambling Machines.) However, even if the State's concerns could be accepted at face value, nothing has been accomplished in this case by the prosecution of these defendants. The State concedes that it has no authority to prosecute Indians for activities conducted on Indian land, and therefore, Donald Juneau's partners who are Indian, continued to operate the Montana Restaurant and Casino (at least at the time of the District Court hearing in this case) in the same fashion that they have always operated it without any interference

24

from the State. Refusal to allow the State to regulate the defendants' gambling activities on Indian land will have absolutely no adverse impact on the State's overall regulation of gaming in the State of Montana.

## CONCLUSION

For these reasons, I do not see how any responsible consideration of the factors we have been compelled to consider by the U.S. Supreme Court in *White Mountain* can lead to any conclusion other than that, when considering state, federal, and tribal interests in the context of this case, the exercise of State authority over the defendants for the crimes they have been charged with would violate federal law and unreasonably interfere with the tribal interests which are at stake.

Therefore, I conclude that the judgment of the District Court should be reversed and the charges against the defendants should be dismissed.

_____
Justice

Justice Karla M. Gray concurs in the foregoing concurrence and dissent.

_____
Justice

25